**POLAR SHIPPING LIMITED,**
**Plaintiff-Appellant,**

v.

**ORIENTAL SHIPPING CORPORATION;**
**Taiwan Marine Corporation; Sanko**
**Steamship Company, Limited, Defendants-Appellees,**

**and**

**Pacific Resources, Inc.; Pacific Resources**
**Terminals, Inc.; Hawaiian Independent**
**Refinery, Inc.; Shell International Petroleum Co., Ltd.; Shell Oil Company;**
**and Pacific Resources, Ltd., Garnishees.**

**No. 79–4485.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 14, 1981.

Reassigned April 7, 1982.

Decided June 30, 1982.

628

Raymond A. Connell, Healy & Baillie, New York City, argued, for plaintiff-appellant; David W. Proudfoot, Bruce Bigelow, Case, Kay & Lynch, Honolulu, Hawaii, on brief.

Sheldon A. Vogel, Thacher, Proffitt & Wood, New York City, argued, for defendants-appellees; George W. Ashford, Jr., Honolulu, Hawaii, on brief.

Before DUNIWAY and ALARCON, Circuit Judges, and BYRNE,* District Judge.

DUNIWAY, Circuit Judge:

### I. The Facts.

On January 15, 1970, Polar Shipping Limited ("Polar"), as owner, and Oriental Shipping Corporation, as charterer, entered into a charter of the vessel M/T Polar Saturn, since renamed Globtik Saturn. The charter was amended to name Oriental and S.S. Sanko Co., Ltd., jointly and severally, as charterers. Oriental is now called Taiwan Marine Corporation. We refer to the charterers as "Sanko."

The charter, a printed form known as a "SHELLDEMISE," was for a term of nine years, with provisions for an extension and for redelivery of the vessel upon expiration. Clause 22 of the charter provided:

Law and Litigation.

22(a) The charter shall be construed and the relations between the parties determined in accordance with the Law of England.

(b) Any dispute arising under this charter shall be decided by the English Courts to whose jurisdiction the parties agree whatever their domicile may be:

Provided that either party may elect to have the dispute referred to a single arbitrator in London in accordance with the provisions of the Arbitration Act, 1950, or any statutory modifications or re-enactment thereof for the time being in force. Such election shall be made by written notice by one party to the other no later than 21 days after receipt of a notice given by one party to the other of a dispute having arisen under this charter.

Claiming expiration of the charter, Polar demanded redelivery of the vessel. Sanko failed to redeliver and, on March 13, 1979, Polar filed this action against Sanko in the United States District Court for the District of Hawaii, invoking admiralty jurisdiction (28 U.S.C. § 1333), alleging breach of the charter, and claiming damages of at least $1,000,000. Polar also obtained a writ of foreign attachment and garnishment, pursuant to Rule B of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure ("Supplemental Rule B"). The writ eventually resulted in the attachment in Hawaii of

---

* The Honorable Wm. Matthew Byrne, Jr., United States District Judge for the Central District of California, sitting by designation.

$907,324.51 that Pacific Resources, Ltd. owed to Sanko as freight charges of the Globtik Saturn. On April 24, 1979, the district court ordered Pacific Resources, Ltd. to pay that sum into the registry of the court.

Under Supplemental Rule B, *in personam* jurisdiction over the defendant is obtained by compelling its appearance through attachment of its goods and chattels, or credits and effects. *See Swift & Co. Packers v. Compania Columbiana del Caribe*, 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed. 1206; *see generally* 7A Moore's *Federal Practice*, ¶ B.02 at B–51 (2d ed. 1981).

On May 11, 1979, Sanko moved, under F.R.Civ.P. 12(b), to dismiss Polar's complaint and to vacate the writ of attachment on the ground that clause 22 of the charter precluded the exercise of jurisdiction by the district court. Alternatively, Sanko argued that the attachment procedure provided by Supplemental Rule B violated its rights to due process as guaranteed by the Fifth Amendment of the United States Constitution.

On June 18, 1979, Polar demanded arbitration of the dispute. In its opposition to Sanko's motion to dismiss, Polar asked the court to retain jurisdiction and maintain the security obtained by the writ of attachment pending an arbitral decision, pursuant to Section 8 of the Federal Arbitration Act, 9 U.S.C. § 8 (1976). Sanko responded that Polar's demand for arbitration was untimely under clause 22 and that the claim should be referred to the High Court of Justice in London for a determination on the merits.

On June 27, 1979, the court ruled that clause 22 of the charter is a valid forum selection clause. The court stated:

> [Clause 22] manifest[s] an intention that all official proceedings resulting from or touching on a dispute under the charter will be conducted in English Courts by arbitration and resolved in conformity with the law of England. Since this was the parties' apparent intention, this action must be dismissed.

The court, without addressing the due process issues raised by Sanko, dismissed Polar's complaint without prejudice and vacated the writ of attachment. Polar appeals from that order. On appeal, Sanko reasserts its constitutional challenge to Supplemental Rule B.

On July 10, 1979, Polar filed its Notice of Appeal and a stipulation whereby the parties agreed that Polar would deposit $125,-000 into the registry of the district court and Sanko's freight would remain under attachment pending the outcome of this appeal.

On July 20, 1979, the English High Court of Justice denied Polar's motion to compel arbitration on the ground that Polar had not timely demanded arbitration. The action is now pending before the High Court of Justice for a determination on the merits.

■ The judgment, on its face, dismisses the complaint, rather than the action. Nevertheless, the judgment, and the order vacating the attachment, are appealable. *Swift & Co. Packers, supra*, 339 U.S. at 688–689, 70 S.Ct. at 864–865.

## II. *The Nonconstitutional Issues.*

■ Both constitutional and nonconstitutional issues have been raised on this appeal. We should not pass upon a constitutional question, although it be properly presented by the record, if there is a nonconstitutional ground upon which the case may be decided. *See Wood v. Strickland*, 1975, 420 U.S. 308, 314, 95 S.Ct. 992, 996, 43 L.Ed.2d 214. If this court affirms the order of the district court on other than constitutional grounds, it need not reach Sanko's constitutional challenge to the maritime attachment procedures of Supplemental Rule B. Therefore, we first address the nonconstitutional issues raised by Polar.

### A. *Section 8 of the Arbitration Act.*

■ Polar does not challenge the district court's ruling that clause 22 of the charter is enforceable, and it therefore concedes that the merits of this dispute are to be determined by the English High Court of Justice. Polar argues, however, that be-

cause clause 22 of the charter includes a foreign arbitration provision, Polar has a statutory right, under section 8 of the Arbitration Act, to have the security provided by the writ of attachment maintained, pending a determination of the merits in London. We do not agree.

The right to compel arbitration under the Arbitration Act depends on the existence of a contract to arbitrate, 9 U.S.C. § 2. Here, one term of the contract is that a party may "elect" arbitration, and that "such election shall be made by written notice . . . no later than 21 days after receipt of a notice given by one party to the other of a dispute having arisen under this charter." The High Court has held that the election was not made within the prescribed time, and thus the right to arbitration never came into being. Section 8 provides that "the court shall then [i.e., after libel and seizure of the vessel or other property] have jurisdiction to direct the parties to proceed with the arbitration and shall retain jurisdiction to enter its decree upon the award." Here, the court cannot direct arbitration, and there will be no award upon which to enter a decree. This case, therefore, is now in the same posture as if the charter did not contain a provision for arbitration but merely a foreign court selection clause.

In view of our holding, we need not decide the issue raised by Sanko, whether the maintenance of an attachment pending arbitration, as provided by section 8, is barred by the Convention on the Recognition and Enforcement of Foreign Arbitration Awards, acceded to by the United States in 1970, 21 U.S.T. 2517, T.I.A.S. No. 6997, and implemented by Chapter 2 of the Arbitration Act, 9 U.S.C. §§ 201–08 (1970). *See Parsons & Whittemore Overseas Co., Inc. v. Societe Generale De L'Industrie*, 2 Cir., 1974, 508 F.2d 969.

### B. *The Foreign Court Selection Clause and Supplemental Rule B.*

The next issue is whether Polar has a right under Supplemental Rule B to the maintenance of security by the district court notwithstanding that section 8 is in-applicable, and notwithstanding the presence of a foreign court selection clause.

■ In admiralty actions, a foreign court selection clause will be enforced unless the resisting party can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." *The Bremen v. Zapata Off-Shore Co.*, 1972, 407 U.S. 1, 15, 92 S.Ct. 1907, 1916, 32 L.Ed.2d 513. *See also Tai Kien Indus. Co., Ltd. v. M/V Hamburg*, 9 Cir., 1976, 528 F.2d 835, 836. In this case, no such showing has been made, and therefore the foreign court selection clause must be specifically enforced. Indeed, Polar does not challenge the enforceability of the clause.

■ Polar argues that the court erred in unconditionally dismissing the action and vacating the writ of attachment, and that the court should either have maintained the attachment pending a judgment by the High Court of Justice, or conditioned dismissal of the complaint and vacating the writ upon the posting of adequate security in London.

It is clear from *The Bremen* and its Ninth Circuit progeny that where there is an enforceable foreign court selection clause, dismissal of the action is generally appropriate. *See Tai Kien Industries Co., Ltd., supra; Republic International Corp. v. Amco Engineers, Inc.*, 9 Cir., 1975, 516 F.2d 161, 168. However, neither the Supreme Court in *The Bremen*, nor this court, has addressed the issue of whether, in an admiralty and maritime action where there is an enforceable foreign court selection clause, the district court, instead of unconditionally dismissing the action, may ensure the availability of security pending a determination of the merits in the contractually selected forum.

In *Sanko Steamship Co. v. Newfoundland Refining Co., Ltd.*, S.D.N.Y., 1976, 411 F.Supp. 285, aff'd, 2 Cir., 1976, 538 F.2d 313, cert. denied, 429 U.S. 858, 97 S.Ct. 158, 50 L.Ed.2d 136, the district court considered a forum selection clause similar to the one before us. After filing its complaint, the

plaintiff *Sanko,* pursuant to Supplemental Rule B and by an order to show cause, sought an attachment under provisions of New York C.P.L.R. § 6201. That section provides for an attachment "when: 1. the defendant is a foreign corporation or not a resident or domiciliary of the state...." The defendants moved to dismiss on the ground that the forum selection clause precluded the plaintiff from invoking the jurisdiction of the district court. The court held that *The Bremen* required dismissal of the action, although it noted that "no question of the validity of an attachment was before the Court in that case." (411 F.Supp. at 286). We cannot agree with this holding. We find nothing in *The Bremen* that mandates dismissal of every action brought in a forum other than the one specified in a valid forum selection clause. Nor does the absence of an express provision in either Supplemental Rule B or in any federal statute authorizing the maintenance of an attachment pending a judgment by the selected forum persuade us that the court may not do so to ensure the availability of security to satisfy a judgment by the selected forum.

The enforceability of foreign court selection clauses is a matter of judicially-created contract law. *See The Bremen,* 407 U.S. at 11–12, 92 S.Ct. at 1913–1914. The question, then, is, what does the contract permit or require? Does it permit attachment in another forum, and maintenance of the attachment pending decision in the contractually selected forum? Or does it prohibit attachment in another forum, and thus require that any such attachment, if obtained, be vacated?

█ In *The Bremen,* the Court expressly rejected the argument that foreign court selection clauses "oust" a district court of jurisdiction. 407 U.S. at 12, 92 S.Ct. at 1914. The Court said:

> [t]he threshold question is whether [the district] court should have exercised its jurisdiction to do more than give effect to the legitimate expectations of the parties, manifested in their freely negotiated agreement, by specifically enforcing the forum clause. *Id.*

Thus, because the scope and enforcement of a forum selection clause is a matter of contract, the intent of the parties governs the extent to which the non-selected court may exercise its jurisdiction.

Clause 22 provides that "[a]ny dispute arising under the charter shall be decided by the English Courts." It is clear, therefore, that the parties intended that they would litigate the merits of any dispute arising under the charter, whether in an action *in personam* or in one *in rem,* in an English forum. *See The Bremen, supra,* 407 U.S. at 20, 92 S.Ct. at 1918. There is, however, no indication, from either the charter or the record, that the parties intended to limit proceedings to obtain prejudgment security to that forum. If the parties had so intended they could easily have worded clause 22 to so provide. They did not do so.

In *The Bremen,* the forum selection clause stated that "[a]ny dispute arising must be treated before the London Court of Justice." 407 U.S. at 2, 92 S.Ct. at 1909. The Court stated that "the language of the clause is clearly mandatory and all-encompassing." *Id.* at 20, 92 S.Ct. at 1918. That statement, however, was made in reference to whether the clause encompassed actions *in rem* as well as actions *in personam.* The Court did not consider whether prejudgment security proceedings or post-judgment enforcement actions are within the scope of the forum selection clause. An attachment does not fit neatly within the word "dispute."

█ Clause 22 provides that the charter shall be construed in accordance with the law of England. Under English law, as under United States law, the enforceability of a foreign court selection clause is a matter of judicial discretion. *See The Eleftheria,* [1969] 1 Lloyd's List L.Rep. 237 (Q.B. 1969), *cited in The Bremen,* 407 U.S. at 11 n.12, 92 S.Ct. at 1913 n.12; *Unterweser Reederei G. m. b. v. Zapata Off-Shore Co.* [The Chaparral], [1968] 2 Lloyd's List L.Rep. 158 (CA) (the English court proceedings in *The Bremen* case). The English rule

provides that the enforcing court may take steps to ensure the plaintiff of adequate security to prevent prejudice that might otherwise result from the enforcement of a forum selection clause. *See, e.g., The Eleftheria,* at 246; *The Makefjell* [1975] 1 Lloyd's List L.Rep. 528 (Q.B.1975), aff'd [1976] 2 Lloyd's List L.Rep. 29 (Ct. of App. 1976). Thus, under the law chosen by the parties here to govern the construction of their charter, it appears that the foreign court selection provision of clause 22 does not preclude Polar from obtaining prejudgment security by maritime attachment in the district court or preclude the district court from ensuring the availability of adequate security in the selected court before dismissing the action.

We think that strong policy reasons also support the conclusion just stated. A primary reason for parties to agree to a foreign court selection clause, particularly one that names the English courts, is to achieve a neutral forum and to take advantage of that forum's expertise in admiralty litigation. *The Bremen, supra,* 407 U.S. at 11–12, 92 S.Ct. at 1913–1914. In many admiralty actions, it would be merely fortuitous if the foreign forum, selected for its neutrality and expertise, also had available assets of the defendant to ensure that a judgment rendered by that forum would be enforceable there. We note that Polar is a Liberian corporation, with an office and business in New York, Oriental is a Liberian corporation, with an office and place of business in Japan, and Sanko is a Japanese corporation, with an office and place of business in Japan. For the court to infer that parties to a clause, which provides that all disputes under the charter shall be determined by a selected foreign court, intended that proceedings to obtain prejudgment security be limited to that foreign forum, could substantially prejudice an admiralty plaintiff, by leaving it without an effective remedy.

The dissent in the decision of the Court of Appeals in *The Bremen,* cited with approval by the Supreme Court, 407 U.S. at 10, 92 S.Ct. at 1913, stated that "[a] court may postpone declining jurisdiction until it is sure the foreign court will hear the dispute and provide a remedy." *In re Unterweser Reederei, GMBH,* 5 Cir., 1970, 428 F.2d 888, 906 (Wisdom, J., dissenting).

We hold that in an admiralty action, absent express intent to the contrary, a forum selection clause providing that all disputes under the charter will be determined by a selected foreign court neither precludes a plaintiff from commencing an action in the district court to obtain security by maritime attachment, nor prohibits the district court from ensuring the availability of security adequate to satisfy a favorable judgment by the selected forum.

■ Where, as here, there is a valid and enforceable foreign court selection clause, the district court should exercise its jurisdiction only to the extent necessary to ensure that the plaintiff has an adequate remedy. Where evidence shows that the plaintiff would not be prejudiced by the vacating of prejudgment security, the district court can unconditionally dismiss the action and vacate the writ of attachment. Where the plaintiff would be prejudiced by that action, the district court should either condition its order upon the posting of adequate security in the selected forum, or retain jurisdiction to preserve the security obtained. Absent an express contract to the contrary, the district court has discretion in determining whether it should exercise its jurisdiction to ensure the availability of prejudgment security or unconditionally dismiss the action.

Sanko argues that the district court exercised its discretion here, by unconditionally dismissing Polar's complaint and vacating the writ of attachment. There is, however, no indication that the district court thought that it had any discretion. Moreover, the parties take conflicting positions as to whether Polar would be prejudiced by the unconditional dismissal of this action, and the district court did not address this conflict in its Order. Therefore, if no other issues were presented on this appeal, remand would be appropriate to afford Sanko the opportunity to carry its burden of showing that Polar will not be prejudiced if this action is unconditionally dismissed.

## C. *The District Court's Discretion.*

We do not think that we should remand this case for the court to exercise its discretion without passing upon the Constitutional attacks on Supplemental Rule B. This is because one of the things that the court could do, if the attachment is valid, is to maintain it pending the decision of the English High Court. It would be a disservice to the district court, and a likely source of another appeal, if we were now to refuse to decide the validity of the attachment, leaving that question to the district court. That court, on remand, should know what options are open to it.

## D. *Mootness.*

■ The Sanko freight charges remain under attachment, pursuant to an agreement of the parties, as consideration for the deposit of cash into the registry by Polar, in lieu of a supersedeas bond. This did not moot the question of the validity of the attachment. It remains a "present, live controversy," *Hall v. Beals,* 1969, 396 U.S. 45, 48, 90 S.Ct. 200, 201, 24 L.Ed.2d 214, which should be decided by this court, not only because the funds remain under attachment, but also because Sanko would continue to be adversely affected by the writ of attachment in the event of a remand. The writ of attachment was used to obtain jurisdiction over Sanko and no other base of jurisdiction is asserted by Polar. Thus, Sanko would not be before the district court on such remand, absent the initial invocation of Supplemental Rule B procedures.

In addition, as a practical matter of judicial administration, it would be inappropriate to remand to the district court for reconsideration of the appropriateness of a writ of attachment, if the procedures by which the writ was originally issued are unconstitutional, and the challenge to their constitutionality was made below and on this appeal. If we were to hold Supplemental Rule B unconstitutional, that would be the end of this case. We therefore conclude that the due process issues are properly before us and that it is appropriate to resolve them now.

## III. *The Constitutional Issues.*

## A. *Our Authority to Consider the Constitutionality of Supplemental Rule B.*

■ Supplemental Rule B was promulgated by the Supreme Court. 383 U.S. 1029, 1071–1085, 86 S.Ct. 200–211 (1966). This was done pursuant to an act of Congress, 28 U.S.C. § 2072, which states "The Supreme Court shall have power to prescribe by general rules, the form of process, writs . . . and the practice and procedure of the district courts . . . in . . . admiralty and maritime cases. . . ." The rules are to become effective 90 days after they have been reported to the Congress by the Chief Justice.

There has been much debate as to whether the Court has inherent power to prescribe such rules, or can do so only when the power is delegated to it by the Congress. *See* Wigmore, *All Legislative Rules for Judiciary Procedure are Void Constitutionally,* 23 Ill.L.Rev. 276 (1928); Pound, *The Rule-Making Power of the Courts,* 12 A.B.A.J. 599 (1926); Clinton, *Rule 9 of the Federal Habeas Corpus Rules: A Case Study on the Need for Reform of the Rules Enabling Acts,* 63 Iowa L.Rev. 15 n.26 (1977); *Separation of Powers and the Federal Rules of Evidence,* 26 Hastings L.J. 1059 (1975); Wright, *Procedural Reform: Its Limitations and Its Future,* 1 Ga.L.Rev. 563 (1967); Levin & Amsterdam, *Legislative Control Over Judicial Rulemaking: A Problem in Constitutional Revision,* 107 U.Pa.L. Rev. 1 (1958); Clark, *Power of the Supreme Court to Make Rules of Appellate Procedures,* 49 Harv.L.Rev. 1303 (1936); Sunderland, *Character and Extent of the Rule-Making Power Granted U. S. Supreme Court and Methods of Effective Exercise,* 21 A.B.A.J. 404 (1935); Brown, *Federal Rulemaking: Problems and Possibilities,* Report by the Federal Judicial Center (June 1981).

We need not concern ourselves with this debate. In *Sibbach v. Wilson & Co., Inc.,* 1941, 312 U.S. 1, 9–10, 61 S.Ct. 422, 424, 85 L.Ed. 479, the Court said: "Congress has

undoubted power to regulate the practice and procedure of federal courts, and may exercise that power by delegating to this or other federal courts authority to make rules not inconsistent with the statutes or Constitution of the United States" [footnotes omitted].

It has been established, at least since *Marbury v. Madison*, 1803, 5 U.S. (1 Cranch) 137, 2 L.Ed. 60, that the Supreme Court has and this court since its creation has had both the power and the duty to pass upon the validity of an act of Congress when that question comes before it in a case or controversy. Surely our power and duty are no less in relation to a rule promulgated under a delegation from Congress. As the Court said in a case involving Rule 4(f) of F.R. Civ.P., "The fact that [the Supreme] Court promulgated the rules as formulated and recommended by the Advisory Committee does not foreclose consideration of their validity, meaning or consistency." *Mississippi Publishing Corp. v. Murphree*, 1946, 326 U.S. 438, 444, 66 S.Ct. 242, 245, 90 L.Ed. 185. In *Miranda v. Arizona*, 1966, 384 U.S. 436, 491, 86 S.Ct. 1602, 1636, 16 L.Ed.2d 694, the Court said: "Where rights secured by the Constitution are involved, there can be no rule-making or legislation which would abrogate them."

The Supplemental Rules were not adopted in the process of deciding a "case" or "controversy" within the judicial power as defined in Article III, Section 2, clause 1 of the Constitution. They were drafted by an advisory committee, considered by the Judicial Conference, presented to the Court, and by it presented to Congress, which allowed them to become effective. Thus they resemble legislation, and are quite different from a ruling on a question of constitutional law by the Court in a case or controversy. They are open to attack in such a case, as much in the district court or in this court as in the Supreme Court, just as a statute is.

A holding that the Supreme Court is the exclusive forum for the constitutional review of such rules would mean that litigants would be precluded from obtaining a determination of constitutional challenges

to such rules, unless and until the Supreme Court granted a writ of certiorari or considered an appeal to consider such challenges, which would have had to be raised, but could not be decided, below. We are satisfied that we have not only the authority, but also a duty, to consider the constitutional challenge to Supplemental Rule B presented by Sanko. *See Amstar Corp. v. S/S Alexandros T.*, 4 Cir., 1981, 664 F.2d 904, 906.

To the extent that *Harris v. Zion's Savings Bank*, 10 Cir., 1942, 127 F.2d 1012, 1015, and *In re Bronx Ice Cream Co., Inc.*, 2 Cir., 1933, 66 F.2d 620, 624, appear to be to the contrary, we decline to follow them.

**B.** *The Validity of Supplemental Rule B.*

■ Supplemental Rule B provides in part:

Attachment and Garnishment: Special Provisions

(1) When Available; Complaint, Affidavit, and Process. With respect to any admiralty or maritime claim in personam a verified complaint may contain a prayer for process to attach the defendant's goods and chattels, or credits and effects in the hands of garnishees named in the complaint to the amount sued for, if the defendant shall not be found within the district. Such a complaint shall be accompanied by an affidavit signed by the plaintiff or his attorney that, to the affiant's knowledge, or to the best of his information and belief, the defendant cannot be found within the district. When a verified complaint is supported by such an affidavit the clerk shall forthwith issue a summons and process of attachment and garnishment....

(2) Notice to Defendant. No judgment by default shall be entered except upon proof, which may be by affidavit, (a) that the plaintiff or the garnishee has given notice of the action to the defendant by mailing to him a copy of the complaint, summons, and process of attachment or garnishment, using any form of mail requiring a return receipt, or (b) that the

complaint, summons, and process of attachment or garnishment have been served on the defendant in a manner authorized by Rule 4(d) or (i), or (c) that the plaintiff or the garnishee has made diligent efforts to give notice of the action to the defendant and has been unable to do so.

Sanko argues that the attachment procedure provided by Supplemental Rule B violates the due process clause of the Fifth Amendment because it resulted in a deprivation of property without prior notice and hearing, or other procedural safeguards.

The Supreme Court has sanctioned the process of maritime attachment, in the face of attacks on grounds other than those urged by Sanko. *See, e.g., Swift & Co., supra,* 1950, 339 U.S. 684, 70 S.Ct. 861, 94 L.Ed.2d 1206; *Manro v. Almeida,* 1825, 23 U.S. (10 Wheat.) 473, 490, 6 L.Ed. 369. However, neither that Court nor this court has considered the constitutionality of Supplemental Rule B, on its face or as applied in light of the due process requirements delineated in *Sniadach v. Family Finance Corp.,* 1969, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349, and the line of cases that have followed. *See Fuentes v. Shevin,* 1972, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556; *Mitchell v. W. T. Grant Co.,* 1974, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406; *Calero-Toledo v. Pearson Yacht Leasing Co.,* 1974, 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452; *North Ga. Finishing, Inc. v. Di-Chem, Inc.,* 1975, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751. We proceed to do so.

### 1. *The Special Character of Admiralty Proceedings.*

Article III, Section 2, clause 1 of the Constitution provides: "The judicial power shall extend . . . to all cases of admiralty and maritime jurisdiction. . . ." This jurisdiction is of ancient origin, preceding the independence of the United States and the founding of the Republic. Admiralty law is a species of international law, administered by the courts of maritime nations, including specifically the courts of the United States.

The process of maritime attachment, now provided for in Supplemental Rule B, is at least as old as the Republic. Its history in American courts is outlined in the opinion of Justice Johnson in *Manro v. Almeida, supra,* 23 U.S. (10 Wheat.) at 487–494. At pages 491–492, the Court said:

Thus, this process has the clearest sanction in the practice of the civil law, and during the three years that the admiralty courts of these states were referred to the practice of the civil law for their "forms and modes of proceeding," there could have been no question that this process was legalized. Nor is there anything in the different phraseology adopted in the act of 1792, that could preclude its use. That it is agreeable to the "principles, rules and usages, which belong to courts of admiralty," is established, not only by its being resorted to in one at least of the courts of the United States, but by the explicit declaration of a book of respectable authority, and remote origin, in which it is laid down thus: "If the defendant has concealed himself, or has absconded from the kingdom, so that he cannot be arrested, if he have any goods, merchandise, ship or vessel, on the sea, or within the ebb or flow of the sea, and within the jurisdiction of the Lord High Admiral, a warrant is to be impetrated to this effect, viz., to attach such goods or ship of D., the defendant, in whose hands soever they may be; and to cite the said D. specially as the owner, and all others who claim any right to title to them, to be and appear on a certain day to answer unto P., in a civil and maritime cause." (Clerke's Praxis, by Hall, part 2, tit. 28.)

As the Court said in *Swift & Co. Packers, supra,* 339 U.S. at 693, 70 S.Ct. at 867:

The process of foreign attachment is known of old in admiralty. It has two purposes: to secure a respondent's appearance and to assure satisfaction in case the suit is successful. *Manro v. Almeida,* 23 U.S. (10 Wheat.) 473, 489, 6 L.Ed. 369.

*See also San Rafael Compania Naviera, S.A. v. American Smelting & Refining Co.,*

9 Cir., 1964, 327 F.2d 581, 589, "Foreign attachment ... is 'old process' in admiralty and is recognized in Admiralty Rule 2." That rule was the predecessor of Supplemental Rule B.

In a case in which Supplemental Rule C, dealing with actions *in rem* in admiralty, was attacked as unconstitutional on grounds similar to those asserted before us, *Merchants Nat. Bank v. Dredge Gen. G. L. Gillespie*, 5 Cir., Unit A, 1981, 663 F.2d 1338, at 1343, Judge John R. Brown said:

> For a practice promulgated initially by Federal Courts, and applied and enforced by Federal Courts for well over a century, the words of Mr. Justice Holmes, in *Jackman v. Rosenbaum Co.*, 260 U.S. 22, 31, 43 S.Ct. 9, 10, 67 L.Ed. 107, 112 (1922), are timely:
>
>> The 14th Amendment, itself a historical product, did not destroy history for the states, and substitute mechanical compartments of law, all exactly alike, If thing has been practiced for 200 years by common consent, it will need a strong case for the 14th Amendment to affect it. . . .
>
> What he said of the Fourteenth Amendment applies equally to the present controversy over the due process requirements of the Fifth Amendment. We deal here not with a merely historical abstraction that should be preserved on the basis of its past utility, but with a practical, problem-solving device that retains its importance in contemporary admiralty law.

*See also Amstar Corp. v. S/S Alexandros T.*, 4 Cir., 1981, 664 F.2d 904, which also upholds Supplemental Rule C. Judge Brown expressly limited his decision to Supplemental Rule C, and refrained from intimating any opinion concerning a writ of foreign attachment to obtain jurisdiction over a non-resident defendant in an *in personam* suit, such as we have before us. (Id., n.9.) It may also be that foreign attachment in an *in personam* action in admiralty is not as ancient a remedy as a libel *in rem* against a ship. Nevertheless, we think that the principle announced by Judge Brown is also applicable to Supplemental Rule B. It comes before us with a strong presumption that it is constitutionally valid.

### 2. The Rationale for Supplemental Rule B.

As we have seen, there are two reasons for the procedure authorized in Supplemental Rule B: to assure a respondent's appearance, and to assure satisfaction in case the suit is successful. *Swift & Co. Packers, supra*, 339 U.S. at 693, 70 S.Ct. at 867. Both are of great importance in admiralty and maritime cases. Maritime law deals primarily with ships that sail the seven seas. A ship may be here today and gone tomorrow, not to return for an indefinite period, perhaps never. Assets of its owner, including debts for freights, as in this case, within the jurisdiction today, may be transferred elsewhere or paid off tomorrow. It is for these reasons that maritime actions *in rem*, libelling a ship or other assets of a defendant, Supplemental Rule C, or attachment in actions *in personam*, Supplemental Rule B, were developed. These reasons are as valid today as they ever were. Particularly in the case of debts and credits, such as the debt for freight that was attached in this case, they are necessary and valid today. In this electronic age, freights owing to a charterer, such as Sanko, can be transferred instanter, by electronic orders, from, say, Honolulu, to, say, a numbered bank account in a bank in Switzerland or some other non-maritime haven. The need to attach now and notify later is as great now as it ever was, if not greater. A ship can quietly slip its moorings and depart the jurisdiction. It can easily take with it such tangible property as may be within the jurisdiction. And credits can be quickly transferred elsewhere. These considerations, too, militate in favor of the validity of Supplemental Rule B.

### 3. Pre-attachment Proceedings.

Supplemental Rule B is attacked here as unconstitutional because the writ can be issued on the affidavit of the creditor or its attorney, who need not have personal knowledge of the facts, is issuable by the

clerk, without participation by the judge, and no notice to the defendant is required before the attachment is levied.

### a. *Pre-attachment notice.*

Due process does not require pre-attachment notice. Such notice could readily defeat the whole proceeding. The ship, if it were being libelled under Supplemental Rule C, could depart beyond the jurisdiction; the other property, to be seized under Supplemental Rule C, or attached under Supplemental Rule B, could be shipped out, otherwise disposed of, or concealed; credits, such as are here involved, could be collected or transferred out of the jurisdiction. *See Merchants National Bank, supra,* 663 F.2d at 1344; *Amstar Corp., supra,* 664 F.2d at 911.

*Sniadach, supra,* and its progeny are not to the contrary. *Sniadach* dealt with garnishment of wages in a local common law action. The Court emphasized that "the wage earner is deprived of his enjoyment of earned wages without any opportunity to be heard and to tender any defense he may have...." 395 U.S. 337, 339, 89 S.Ct. 1820, 1821, 23 L.Ed.2d 349. This is a far cry from the case at bar.

In *Fuentes v. Shevin,* the Court stated that notice and an opportunity for a hearing prior to depriving a person of "any significant property interest" generally are constitutional requirements. 407 U.S. at 82, 92 S.Ct. at 1995. There the Court struck down Florida and Pennsylvania laws that authorized the summary seizure of personal property under a writ of replevin. Both statutes provided for the issuance of the writs upon an *ex parte* application, accompanied by a security bond. Neither statute provided for notice to the person in possession of such property, or provided for a pre-seizure hearing. The cases reviewed in *Fuentes* involved replevin of goods purchased under conditional sales contracts—a gas stove, a phonograph, a bed, a table, other household goods, and a father's attempt to recover a small boy's clothing, furniture, and toys. Again this is a far cry from the case at bar.

Moreover, the Court in *Fuentes* distinguished attachments from "outright seizures" of property and noted that it had allowed an attachment of property without a prior hearing in three cases. *Fuentes,* 407 U.S. at 91 n.23, 92 S.Ct. at 1999 n.23. In *Coffin Bros. & Co. v. Bennett,* 1928, 277 U.S. 29, 48 S.Ct. 422, 72 L.Ed. 768, attachment was necessary because of the immediate harm resulting from a bank failure. *Id.* In *Ownbey v. Morgan,* 1921, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837, the attachment was necessary to secure jurisdiction in state court—"clearly a most basic and important public interest." *Id.* The Court was unclear as to the interests involved in *McKay v. McInnes,* 1929, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed. 975, *Id.* In the case at bar, one of the purposes of the attachment, as in *Ownbey,* was to secure jurisdiction.

The Court in *Fuentes* was also at pains to point out that the procedures to obtain and to execute a writ of replevin in the cases before it did *not* resemble "the common-law replevin action of six centuries ago." 407 U.S. at 78–80, 92 S.Ct. at 1993–1994. In that respect, Supplemental Rule B differs from the procedure considered in *Fuentes.*

Pre-attachment notice and hearing could, as we have explained, defeat both of the purposes of the attachment—obtaining jurisdiction, and obtaining security.

For all of these reasons, we do not find *Fuentes* controlling here.

In *Mitchell v. W. T. Grant Co., supra,* the Court upheld Louisiana's sequestration procedures, allowing prejudgment seizure of goods on behalf of the seller-creditor, without affording the buyer-debtor prior notice and opportunity to be heard. The Court emphasized that it had previously "unanimously approved prejudgment attachment liens effected by creditors without notice, hearing, or judicial order....," 416 U.S. at 613, 94 S.Ct. at 1903, citing *Coffin Bros. v. Bennett,* 1928, 277 U.S. 29, 31, 48 S.Ct. 422, 423, 72 L.Ed. 768; *Ownbey v. Morgan,* 1921, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed.2d 837; *McKay v. McInnes,* 1929, 279 U.S. 820, 49 S.Ct. 344, 73 L.Ed.2d 975. It also emphasized the danger that the defendant might

sell or otherwise dispose of the goods, 416 U.S. at 605, 94 S.Ct. at 1899, and that the property would diminish in value while it remains in the debtor's possession. *Id.* at 608, 610, 94 S.Ct. at 1900, 1901. *Fuentes* was distinguished, 416 U.S. at 615–616, 94 S.Ct. at 1904. *Mitchell* also involved household goods, a refrigerator, range, stereo, and washing machine. The case is not directly in point here, but supports a conclusion that pre-attachment notice and hearing are not required in our case.

In *Calero-Toledo v. Pearson Yacht Leasing Co., supra,* 416 U.S. 663, 94 S.Ct. 2080, 40 L.Ed.2d 452, the Court again applied the "extraordinary situation" analysis of *Sniadach* and *Fuentes* and upheld the summary seizure and subsequent forfeiture, initiated by government officials, of a yacht that was allegedly used in an illegal smuggling scheme.

Finally, in *North Georgia Finishing, Inc. v. Di-Chem, Inc., supra,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751, the Court struck down a Georgia garnishment statute. Under the Georgia statute, a writ of garnishment was issuable by the court clerk after receipt of an affidavit of a creditor or his attorney. The affidavit had only to contain conclusory allegations, and the statute did not provide for an early post-garnishment hearing. The Court, relying on *Fuentes,* stated that

> [b]ecause the official seizures had been carried out without notice and without opportunity for a hearing *or other safeguard* against mistaken repossession they were held in violation of the Fourteenth Amendment. [emphasis supplied].

419 U.S. at 606, 95 S.Ct. at 722.

We conclude that the foregoing decisions do not require that we hold Supplemental Rule B invalid because it does not provide for pre-attachment notice and hearing. To so hold would negate the two reasons why the "old process" now embodied in the rule was developed and is still needed.

b. *Lack of judicial participation in issuance of the writ.*

In *Mitchell, supra,* the Court, in upholding the Louisiana procedure, remarked that the Court had previously approved prejudgment attachment effected by creditors "without notice, hearing or judicial order," 416 U.S. at 613, 94 S.Ct. at 1903. This is such a case.

In *Mitchell,* the Court relied, in part, on the fact that, under the Louisiana procedure, a judge passed upon the sufficiency of the verified petition or affidavit, 416 U.S. at 616, 94 S.Ct. at 1904. Supplemental Rule B does not contain such a requirement. Nevertheless, we do not think that this requires us to hold the Rule unconstitutional. The Rule does require a verified complaint and an accompanying affidavit stating that the defendant cannot be found within the district. Supplemental Rule E(2)(a) requires that the complaint state the "circumstances from which the claim arises with ... particularity."

The affidavit can be by the plaintiff or his attorney, and upon information and belief. It could hardly be otherwise in an admiralty case. Our case is an example. Polar is a Liberian corporation with its office in New York, and the action was filed by counsel in Hawaii. The complaint is verified by counsel; the affidavit is by counsel. The verification states that none of Polar's officers are within the district, and that the verification is based upon statements and records furnished by the plaintiff, its officers and agents. The affidavit states what the affiant did to determine whether any defendant was within the district. To require that a judge, rather than the clerk, scrutinize these documents, *ex parte,* would add little protection, if any, to the defendants, probably none. The probable product of such a ruling would be more legal boiler plate.

It is not accurate to argue that the verified complaint and affidavit are wholly conclusory. The complaint has as an exhibit a copy of the charter, and points out the claimed violation by Sanko. The affidavit states what the attorney did to find Sanko in the district, checking all telephone listings in the district, and with the Depart-

ment of Regulatory Agencies of the State of Hawaii, and finding no reference to Sanko. Sanko claims to be one of the largest shipping companies in the world. If it were "present" in Hawaii, it would be surprising if it did not have a telephone, and was not known to the state agency.

We do not think that either *Mitchell, supra,* or *North Georgia Finishing, Inc., supra,* is applicable here to invalidate the attachment. Both cases are progeny of *Fuentes, supra,* and in that case an exception to its holding was noted for cases such as this one, where a purpose of the procedure is to obtain jurisdiction, which the Court referred to as "clearly a most basic and important public interest." 407 U.S. at 91, n.23, 92 S.Ct. at 1999, n.23. Moreover, as we have shown, the procedures of admiralty have a history and sanction of their own.

### c. *Lack of requirement that the plaintiff post a bond.*

We do not think that the Fifth Amendment requires that a bond be posted before the writ issues. The suggestion is not a practical one. The writ in this case was served on a number of respondents who, the plaintiff thought, were likely to have property of, or owe money to, Sanko. Only one responded that it owed money to Sanko. None held property for Sanko. In most cases, absent some special circumstances, such as a conditional sale contract, a mortgage, or a lease, for example, the plaintiff will not know, though it may suspect, that a particular person or concern has property of, or owes money to, a defendant. Much less is the plaintiff likely to know the property's value or the amount of the debt. How, then, is the amount of the bond to be fixed? Supplemental Rule E(2)(b) does permit the court to require a bond for costs and expenses. It does not provide for a pre-attachment bond, probably for the very good reason that, until the writ is served and a response is made, there is no way in which to fix the proper amount of the bond.

### 4. *Post-attachment Proceeding.*

### a. *Notice and hearing.*

The Court has held that where no pre-attachment notice and hearing are afforded, an immediate and adequate post-attachment hearing is constitutionally mandated. *See North Georgia Finishing, Inc., supra,* 419 U.S. at 607, 95 S.Ct. at 722, (Opinion of the Court); 419 U.S. at 612–13, 95 S.Ct. at 725–26 (Powell, J., concurring) ("[t]he most compelling deficiency in the Georgia procedure is its failure to provide a prompt and adequate post-garnishment hearing"), 419 U.S. at 611 n.3, 95 S.Ct. at 725 n.3 (Powell, J., concurring) ("[t]he basic protection required for the debtor is the assurance of a prompt postgarnishment hearing before a judge"); *Mitchell, supra,* 416 U.S. at 618, 94 S.Ct. at 1905; (Opinion of the Court); 416 U.S. at 625, 94 S.Ct. at 1908 (Powell, J., concurring).

Supplemental Rule B does not expressly provide for a post-garnishment or post-attachment hearing that could result in vacating an attachment. The district courts, however, retain the power to make local rules consistent with the Supplemental Rules. *See* Notes of Advisory Committee to Supplemental Rule A.

Admiralty Rule 55 of the United States District Court for the District of Hawaii provides:

[I]n case of the attachment of property, ... in causes of ... admiralty jurisdiction ..., any person having a right to intervene in respect to the thing attached, may upon evidence showing any improper practices or a want of equity on the part of the libelant, have a mandate from the judge for the libelant to show cause *instanter* why the ... attachment should not be vacated.

5D E. Benedict, Admiralty, 2705 (Knauth 7th rev. ed. 1979). The term "instanter" is usually understood to mean within twenty-four hours. Black's Law Dictionary 939 (4th ed., 1968). And under Admiralty Rule 38 of the District of Hawaii, the court "shall be deemed always open for the purpose of making and directing all interlocu-

tory motions, [and] orders." Benedict, at 2705.

Providing an immediate post-attachment hearing for a determination of whether an attachment is based on a frivolous or clearly meritless claim, or has been effected despite the presence of the defendant in the district, is consistent with the language and purposes of Supplemental Rule B. Therefore, Supplemental Rule B, as supplemented by the local rules, generally provides a defendant in admiralty, in the District of Hawaii, with a prompt and adequate post-attachment hearing.

A prompt hearing, however, is only possible if the defendant is provided with prompt notice. Supplemental Rule B only expressly requires that notice be given to the defendant before a default judgment can be entered and the property sold to satisfy the plaintiff's claim. Affording post-attachment or garnishment notice, sufficient to provide the defendant an opportunity for an immediate hearing, is not, however, inconsistent with Supplemental Rule B.

The Advisory Committee on Supplemental Rules stated that notice to the defendant in an attachment and garnishment proceeding is not required by the principles of due process, "since it is assumed that the garnishee or custodian of the property attached will either notify the defendant or be deprived of the right to plead the judgment as a defense in an action against him by the defendant." Advisory Committee Note on Supplemental Rule B(2), *citing Harris v. Balk*, 1905, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023; *Pennoyer v. Neff*, 1878, 95 U.S. 714, 24 L.Ed. 565. The Committee concluded, however, that

> [m]odern conceptions of fairness ... dictate that actual notice be given to persons known to claim an interest in the property that is the subject of the action, where it is reasonably practicable. In attachment and garnishment proceedings the persons whose interests will be affected by the judgment are identified by the complaint. No substantial burden is imposed on the plaintiff by a simple re-

quirement that he notify the defendant of the action by mail.

> In the usual case the defendant is notified of the pendency of the proceedings by the garnishee or otherwise, and appears to claim the property and to make his answer. Hence notice by mail is not routinely required in all cases, but only in those in which the defendant has not appeared prior to the time when a default judgment is demanded.

*Id.*

Here, Sanko received actual and reasonably prompt notice of the pendency of the proceedings. Polar filed its original complaint on March 13, 1979. By March 22, 1979, Sanko had notice of the instant action. The attachment was effected on April 4, 1979. Although local counsel had been retained by Sanko as of April 3, 1979, Sanko did not make a formal appearance until the filing of its motion to dismiss on May 11, 1979. Thus, it appears that Sanko received reasonably prompt and adequate notice but failed to utilize the most immediate post-garnishment remedy available.

We need not decide whether, in a case in which no notice was given to or received by the defendant, the attachment would be unconstitutional because Supplemental Rule B does not require an earlier notice.

b. *Post-attachment release of property attached.*

The Court has indicated that attachment and garnishment procedures should provide a defendant with the opportunity to obtain release of properly attached or garnished property, upon the posting of an adequate bond. *See North Georgia Finishing, Inc.*, 419 U.S. at 612, 95 S.Ct. at 725 (Powell, J., concurring); *Mitchell*, 416 U.S. at 607, 94 S.Ct. at 1900. Supplemental Rule E(5) provides for such a release upon the posting of a bond by the defendant.

Thus, the post-attachment procedural safeguards, mandated by *Mitchell* and *North Georgia Finishing, Inc.*, have been met by Supplemental Rule B, the applicable

local rules, and the provision of actual notice in this case.

The Judgment dismissing the action, and the order of June 27, 1979, are reversed. The case is remanded to the district court for further proceedings consistent with this opinion.

WM. MATTHEW BYRNE, Jr., District Judge (dissenting):

Although I concur with the majority on the nonconstitutional issues, I must respectfully dissent from the conclusion that Supplemental Rule B, as written and applied, satisfies the due process clause of the Fifth Amendment.

Determining what process is due depends on a balancing of the interests of the parties. *See, e.g., Mitchell v. W. T. Grant*, 416 U.S. 600, 604, 94 S.Ct. 1895, 1898, 40 L.Ed.2d 406 (1974). *Cf. id.* at 610, 94 S.Ct. at 1908 (Powell, J. concurring). Plaintiff has a legitimate interest in securing collateral for the satisfaction of any judgment he might win against the defendant. Without collateral, the judgment, and the effort expended in obtaining the judgment, could be useless. Of course, this is a danger in any litigation, but in admiralty cases the danger of judgment without satisfaction is particularly serious because the only available assets of the defendant—possibly a ship or, as in this case, a bank account—are often easily removable from the jurisdiction. The interest of the defendant is to minimize the risk of a wrongful attachment. Attachment deprives defendant, without any warning, of the temporary use of his property. This denial can be especially costly if it prevents him from using his property to derive profits or meet obligations.

It is the duty of this court to evaluate the panoply of possible procedural safeguards to determine which combination strikes the proper compromise in serving these conflicting interests.

I agree with the majority's conclusion that pre-attachment notice and hearing are not constitutionally required.[1] The very purpose of attachment is to prevent the removal or concealment of assets after the defendant is notified of a pending suit. Pre-attachment notice would destroy the protection that attachment was created to provide. Once put on guard, the defendant may nullify the effectiveness of the judicial remedy by removing his assets from the jurisdiction of the court and possibly the United States as well. Therefore, requiring pre-attachment notice and hearing, while furthering the defendant's interest, would leave the interest of the plaintiff unprotected.

In the absence of pre-attachment notice and hearing, prompt post-attachment notice and hearing are constitutionally required. *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 607, 95 S.Ct. 719, 723, 42 L.Ed.2d 751 (1975); *Mitchell*, 416 U.S. 600, 618, 94 S.Ct. 1895, 1905, 40 L.Ed.2d 406 (1974). Supplemental Rule B does not require prompt notice and hearing after attachment and, therefore, on its face, violates due process. Nonetheless, the constitutional notice and hearing requirement was met in this case because Sanko, in fact, received prompt notice of attachment and had the opportunity under the Local Rules of the District of Hawaii and Supplemental Rule B to obtain a timely hearing.

Even when post-attachment notice and hearing are provided, I would find that Supplemental Rule B, both as written and applied, violates due process because it fails to adequately protect against wrongful deprivation.[2]

Post-attachment notice and hearing provide a defendant no protection against the

---

**1.** *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 607, 95 S.Ct. 719, 723, 42 L.Ed. 751 (1975); 419 U.S. at 612–13, 95 S.Ct. at 725 (Powell, J., concurring) ("[t]he most compelling deficiency in the Georgia procedure is its failure to provide a prompt and adequate post-garnishment hearing"); 419 U.S. at 611 n.3, 95 S.Ct. at 725 n.3 (Powell, J., concurring) ("[t]he basic protection required for the debtor

is the assurance of a prompt post-garnishment hearing before a judge"); *Mitchell*, 416 U.S. at 618, 94 S.Ct. at 1905; 416 U.S. at 625, 94 S.Ct. at 1909 (Powell, J., concurring).

**2.** Other courts have held that the attachment procedures of Supplemental Rules B & C do not comport with the requirements of due process. *See Alyeska Pipeline Serv. Co. v. Bay Ridge,*

initial wrongful deprivation of property; they merely limit the time the deprivation can persist. When a defendant is not provided notice and hearing until after the attachment, the due process clause requires that certain procedural safeguards be observed in the ex parte issuance of a summons of attachment.

509 F.Supp. 1115 (D.Alaska 1981) (Supplemental Rule C attachment unconstitutional under circumstances of case); *Karl Senner, Inc. v. M/V Acadian Valor*, 485 F.Supp. 287 (E.D.La. 1980) (Supplemental Rule C attachment unconstitutional where court had personal jurisdiction over defendant); *Grand Bahama Petroleum Co., Ltd. v. Canadian Transportation Agency, Ltd.*, 450 F.Supp. 447 (W.D.Wash.1978); *Cook Indus., Inc. v. Toyko Marine Co., Ltd.*, 1978 A.M.C.1979 (D.Alaska 1978) (adopting the rationale of *Grand Bahama*); *Merchants Nat. Bank v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1351–1353 (5th Cir. 1981) (Tate, J. dissenting); *see generally Techem Chem. Co., Ltd. v. M/T Choyo Maru*, 416 F.Supp. 960 (D.Md. 1976) (constitutionality of attachment under Supplemental Rules seriously questioned); 7a Moore's *Federal Practice* ¶ E.10, at E–456 (2d ed. 1981) ("the admiralty's practice of near-automatically issuing process *in rem* and of attachment and garnishment is nonetheless still vulnerable to attack"); Note, *Due Process in Admiralty Arrest and Attachment*, 56 Tex.L. Rev. 1091 (1978); Note, *The Due Process Mandate and the Constitutionality of Admiralty Arrests and Attachments Pursuant to Supplemental Rules B and C*, 12 Vand.J. of Trans'l Law 421 (1979); Morse, *The Conflict between the Supreme Court Admiralty Rules and Sniadach-Fuentes: A Collision Course?*, 3 Fla.St.U.L.Rev. 1 (1975); *but see Merchants Nat'l Bank*, 663 F.2d 1338 (Supplemental Rule C attachment constitutional); *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904 (4th Cir. 1981) (Supplemental Rule C attachment constitutional under circumstances of case); *United States v. Kaiyo Maru No. 53*, 503 F.Supp. 1075 (D.Alaska 1980) (Supplemental Rule C constitutional as an "extraordinary situation" in the context of an attachment effectuated by the federal government); *Central Soya Co., Inc. v. Cox Towing Corp.*, 417 F.Supp. 658 (N.D.Miss.1976) (Supplemental Rule C attachment constitutional as an "extraordinary situation"); *A/S Hjalmer Bjorges Rederi v. The Tugboat Condor*, 1979 A.M.C. 1696 (S.D.Cal.1979) (same); *Stoner v. O/S Neiska II*, 1978 A.M.C. 2650 (D.Alaska 1978) (same); *Bethlehem Steel Corp. v. S/T Valiant King*, 1977 A.M.C. 1719 (E.D.Pa.1974) (Supplemental Rule C attachment constitutional).

A plaintiff seeking a summons of attachment in an ex parte proceeding must make a particularized factual showing of entitlement to attachment.[3] This showing must be evaluated by a judicial officer [4] who has the discretion to grant or deny the request. The judicial officer must then determine whether there is probable cause for an at-

**3.** *See North Georgia Finishing, Inc.*, 419 U.S. at 607, 95 S.Ct. at 722 (1975); 419 U.S. at 611, 95 S.Ct. at 725 (Powell, J., concurring); *Mitchell*, 416 U.S. at 675, 94 S.Ct. at 1909 (Powell, J., concurring). It is unclear from the cases whether a party seeking attachment must show both a need for the attachment and a colorable claim on the merits of the case. Even if the dual showing is not required in the relatively simple debtor-creditor cases such as *North Georgia Finishing* and *Mitchell*, I believe such a showing should be required in admiralty, which runs the gamut of tort, contract and carriage actions.

**4.** In *Mitchell*, the plurality opinion in upholding the validity of Louisiana sequestration statutes, emphasized that a judge had participated in the issuance of the writ. 416 U.S. at 616–17, 94 S.Ct. at 1904–05. In his concurring opinion, Justice Powell stated that "the constitutional guarantee of procedural due process is fully satisfied in cases of this kind where state law requires . . . that the creditor . . . make a specific factual showing before a *neutral officer or magistrate* of probable cause to believe that he is entitled to the relief requested." [emphasis supplied]. 416 U.S. at 625, 94 S.Ct. at 1909.

*North Georgia Finishing* invalidated a garnishment statute. The plurality distinguished the case before it, where a writ was issuable by the court clerk, from *Mitchell*, where a judge had participated in the issuance. 419 U.S. at 607, 95 S.Ct. at 722. Concurring, Justice Powell stated that adequate protection was afforded the defendant where state law required that the garnishment be preceded by the garnishor's establishing "before a neutral officer . . . a factual basis of the need to resort to the remedy." 419 U.S. at 611, 95 S.Ct. at 725. Justice Powell noted that he was

not in accord with the Court's suggestion that the Due Process Clause might require that a *judicial* officer issue the writ of garnishment. . . . It thus should be sufficient for a clerk or other officer of the court to issue the original writ upon the filing of a proper affidavit.

419 U.S. at 611 n.3, 95 S.Ct. at 725 n.3.

The potential complexity and magnitude of the seizures in admiralty cases militate strongly in favor of participation by a judicial officer in the issuance of a summons of attachment.

tachment.[5] If the summons is issued, the plaintiff is required to post a bond prior to its execution.[6] These safeguards adequately protect the defendant against wrongful deprivation of property without imposing a significant burden on the plaintiff or the court.

Supplemental Rule B does not require a particularized showing. Nor must a judicial officer be involved; the issuance of the summons of attachment is handled solely by the court clerk. The clerk is not allowed to consider the contents of the document filed or exercise discretion as to the issuance of the summons. Upon the filing of a verified complaint, accompanied by an affidavit of the plaintiff or his attorney, which may consist of conclusory statements based on information and belief, the clerk *must* issue the summons. No bond is required prior to the attachment.

The majority opinion indicates that the complaint and the affidavit in this case were sufficiently particularized. Even assuming the correctness of this finding, Supplemental Rule B, as applied here, is constitutionally deficient for the lack of a pre-attachment bond and a judicial determination that the complaint and affidavit justified attachment.

The majority finds that neither *North Georgia Finishing* nor *Mitchell* are applicable here to invalidate the attachment. They first argue that admiralty attachment should be presumed constitutional because it is an ancient procedure. It may be that there is an historical presumption in favor of attachment prior to notice and hearing. However, there is no presumption in favor of attachment without other procedural safeguards. *See Grand Bahama Pet. Co., Ltd. v. Canadian Transp.*, 450 F.Supp. 447, 459 (W.D.Wash.1978).

**5.** *See North Georgia Finishing, Inc.*, 419 U.S. at 611, 95 S.Ct. at 725 (Powell, J., concurring) ("[p]rocedural due process would be satisfied where state law requires that the garnishment be preceded by the garnishor's provision of adequate security and by his establishment before a neutral officer of a factual basis of the need to resort to the remedy . . . ." [footnote omitted]; *Mitchell*, 416 U.S. at 616, 94 S.Ct. at 1904 ("[w]here this case arose, the requisite showing must be made to a judge, and judicial authorization obtained"; defendant "was not at the unsupervised mercy of the creditor and court functionaries"); 416 U.S. at 625, 94 S.Ct. at 1909 (Powell, J., concurring) (due process is satisfied where, among other safeguards, the creditor must "make a specific factual showing before a neutral officer or magistrate of probable cause to believe that he is entitled to the relief requested"); *Fuentes*, 407 U.S. at 80, 92 S.Ct. at 1994 (under common law procedures "a state official made at least a summary determination of the relative rights of the disputing parties before stepping into the dispute and taking goods from one of them").

In *Mitchell*, the Court noted that approval of a writ of sequestration by a neutral officer is not "a mere ministerial act." Under the Louisiana procedures at issue there, specific facts as to the grounds relied upon for issuance of the writ must be contained in the verified petition "in order that the issuing judge can properly evaluate the grounds." 416 U.S. at 616 n.12, 94 S.Ct. at 1905 n.12, *quoting Wright v. Hughes*, 254 So.2d 293, 296–97 (La.Ct.App.1971). The Supreme Court also cited *Hancock Bank v. Alexander*, 256 La. 643, 653–54, 237 So.2d 669, 672 (1970) (the remedies should not be availed

unless "the proper grounds be alleged and sworn to").

The Third Circuit has stated the clear concern of the Supreme Court in *Mitchell* and *Di-Chem* is "that the official making the required determinations exercise some discretion and possess the necessary professional competence" to determine whether a writ should issue. *Jonnet v. Dollar Savings Bank of City of N. Y.*, 530 F.2d 1123, 1130 n.15 (3d Cir. 1976).

**6.** *See North Georgia Finishing Inc.*, 419 U.S. at 606–07, 95 S.Ct. at 722–23; 419 U.S. at 611, 95 S.Ct. at 725 (Powell, J., concurring); *Mitchell*, 416 U.S. at 606, 94 S.Ct. at 1899; 416 U.S. at 625, 94 S.Ct. at 1909 (Powell, J., concurring).

The majority argues that bond should not be required prior to attachment because of the uncertainty in fixing the amount of the bond. This uncertainty in admiralty attachment is not dissimilar to the uncertainty of setting bond in other contexts—for instance, on ex parte applications for seizure of items infringing copyrights, trademarks and patents. The judicial officer can set bond based on a factual presentation by the plaintiff of the value of the assets to be attached. Even if a judicial officer is not involved, bond may be set reasonably on the basis of the amount of damages sought, *see North Georgia Finishing*, 419 U.S. at 604, 95 S.Ct. at 721, and affidavits submitted by the plaintiff to establish the value of the property he seeks to attach. Any imperfections in the method of setting the amount of bond are outweighed by the incremental protection afforded the defendant.

If there is a presumption regarding the ex parte procedures at issue here, it is in favor of those procedures. Supreme Court cases such as *Mitchell* and *North Georgia Finishing* have established that when attachment is obtained ex parte, the balance of interests of the parties favors additional protection of the interest of the defendant, who is unable to oppose attachment. In order to displace these safeguards, the plaintiff must show that his interests would be unreasonably impaired by the procedures. In other words, the plaintiff must show that the detriment he would suffer due to the procedures outweighs the protection afforded the defendant. The plaintiff has made no such showing in this case.

The majority next argues that an admiralty plaintiff's interest in obtaining jurisdiction by attachment distinguishes admiralty actions from other due process cases. The majority finds that *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), carved out an exception for cases involving the need to establish jurisdiction. However, the *Fuentes* footnote upon which they rely merely states that "the Court has allowed attachment of property without prior hearing ... (when) attachment (was) necessary to secure jurisdiction in a state court—clearly a most basic and important public interest." *id.* at 91 n.23, 92 S.Ct. at 1999 n.23, *citing Ownbey v. Morgan*, 256 U.S. 94, 41 S.Ct. 433, 65 L.Ed. 837 (1921). Neither *Fuentes* nor *Ownbey* held that the need to obtain jurisdiction outweighs the need for safeguards in ex parte proceedings. In addition, the majority has not explained how such safeguards impair the interest in obtaining jurisdiction, much less how that presumed impairment outweighs the protection these procedures give to the defendant.

Furthermore, the need to obtain jurisdiction may not even be a factor that this court should consider. *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977), held that quasi in rem jurisdiction violates due process because it does not meet the minimum contacts standard of personal jurisdiction. This holding may well apply in admiralty. *See* Bohmann, *Applicability of Shaffer to Admiralty in Rem Jurisdiction*, 53 Tul.L.Rev. 135 (1978). *Cf. Merchants Nat. Bank v. Dredge Gen. G. L. Gillespie*, 663 F.2d 1338, 1353 (Tate, J. dissenting) (minimum contacts analysis applies to admiralty in rem attachment).

In essence, the majority has decided not to apply the procedural safeguards set forth in *North Georgia Finishing* and *Mitchell* because this is an admiralty case, without explaining how the unique characteristics of admiralty make the safeguards unreasonable. The primary differentiating aspect of admiralty—the mobility of the assets to be attached—justifies an attachment without prior notice and hearing. It does not, however, justify the absence of a pre-attachment bond, a particularized showing of entitlement and a judicial determination whether the summons of attachment should issue. These safeguards provide defendants adequate protection against wrongful deprivation of property while imposing no significant burdens on the plaintiff or the courts. Accordingly, I dissent.