**SCHIFFAHRTSGESELLSCHAFT LEONHARDT & CO.,**
Plaintiff-Appellant,

v.

**A. BOTTACCHI S.A. DE NAVEGACION,**
Defendant-Appellee.

No. 83–8019.

United States Court of Appeals, Eleventh Circuit.

May 29, 1984.

Rehearing En Banc Granted Sept. 21, 1984.

---

Robert S. Glenn, Jr., Savannah, Ga., for plaintiff-appellant.

Lamar Walter, Savannah, Ga., for defendant-appellee.

Before TJOFLAT and HILL, Circuit Judges, and LYNNE *, District Judge.

LYNNE, District Judge:

This appeal involves the chameleon-like concept of procedural due process. While recent Supreme Court discussions on the subject are devoted to common law garnishment, attachment, and sequestration actions, the court below dealt with Supplemental Rule for Admiralty B(1), Federal Rules of Civil Procedure, which authorizes the attachment of maritime property to obtain jurisdiction over a foreign defendant. In this instance, the appellant, Schiffahrtsgesellschaft, attached an Argentine vessel, the M/V *Puntas Malvinas*, purportedly belonging to the appellee, Bottacchi, when it docked at Savannah, Georgia, on May 24, 1982.

Consonant with Rule B(1)'s usual application, the appellant sought jurisdiction over Bottacchi to adjudicate a prior dispute wholly unrelated to the port of Savannah or the vessel attached. Its ultimate goal is to enforce the terms of a New York Produce Exchange Charter Party dated March 16, 1982. Under that agreement, Bottacchi time-chartered one of the appellant's own vessels, the M/V *Barbara Leonhardt*, to deliver goods from St. John's, Canada, to Buenos Aires, Argentina. Heavy weather en route resulted in damage both to cargo and vessel. Upon arrival, Bottacchi refused either to post counter-security for damages or submit to arbitration in accordance with the charter party. Obtaining jurisdiction over Bottacchi is appellant's only means of enforcing these two contractual provisions.

The attachment of the M/V *Puntas Malvinas* was erroneous. According to documents presented by counsel the following day, Bottacchi did not own the vessel. It instead operated the boat under a bareboat charter and therefore only owned certain bunkers and stores aboard. The appellant's attempt at attachment, though flawed, was by no means unfounded. It initiated process only after consulting the most recent supplement to the *Lloyd's Register of Shipping*, which listed Bottacchi as the vessel's owner.

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

The appellant immediately released the vessel and narrowed its action to the limited items owned by the appellee. In each instance, the clerk of the court reviewed the pleadings without judicial assistance. He ordered the Marshal to initiate process based upon the complaint and an affidavit, upon information and belief, that the appellee could not be found within the district. The Marshal, though not required to do so, notified the ship's agent of the impending attachments. Bottacchi obtained immediate release of the property after posting security pursuant to Supplemental Rule for Admiralty E(5). Judge Anthony A. Alaimo granted a post-seizure hearing the following day, at which time Bottacchi assailed the constitutionality of Rule B(1). The parties then filed briefs on the issue and appeared before Judge B. Avant Edenfield on July 22, 1982.

Based on the agent's prior notice of seizure and the hearing conducted by Judge Alaimo, the court declared that Rule B(1), *as applied,* did not violate procedural due process. It went on to hold, however, that on its face Rule B(1) violates procedural due process guarantees on two grounds: (1) failure to provide procedural safeguards in place of pre-seizure notice and hearing; (2) failure to require a prompt post-attachment hearing. *Schiffahrtsgesellschaft v. A. Bottacchi S.A. De Navegacion,* 552 F.Supp. 771 (S.D.Ga.1982).

### Procedural Due Process Inherently Flexible

■ Due process, in its original form, requires that a property owner be given notice and an opportunity to be heard *prior in time* to the seizure of his possessions. *Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 313–316, 70 S.Ct. 652, 656–58, 94 L.Ed. 865 (1950). However, the Supreme Court embarked on a four case dialogue on modern day procedural

due process in *Sniadach v. Family Finance Corp.,* 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). *See Fuentes v. Shevin,* 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Co.,* 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.,* 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1974). While retaining many former views, the Court acknowledged that prior notice could undermine the desired end of seizure in cases where the property is susceptible to ready disposal, concealment, or removal from the jurisdiction.[1] *Mitchell,* 416 U.S. at 610, 94 S.Ct. at 1901. Accordingly, the opportunity to be heard may be delayed until immediately following the seizure if "other procedural safeguards" are imposed during initiation of the process leading to seizure. These safeguards include: (1) posting of bond by the plaintiff prior to execution; (2) particularized factual showings in the pleadings indicating entitlement to relief, (3) judicial review of the pleadings and authorization of proceedings. *Id.* at 605–06, 616–18, 94 S.Ct. at 1904–05. *See also Polar Shipping, Ltd. v. Oriental Shipping Corp.,* 680 F.2d 627, 643–44 (9th Cir.1982).

None of these safeguards, which are intended to compensate for the bypassed pre-seizure hearing, surrounded the attachment of the *Puntas Malvinas.* Additionally, as emphasized by the court below, Rule B(1) does not explicitly provide for either prior notice or a hearing of any kind. These latter deficiencies, however, are not germane to the current dispute. Bottacchi undisputedly received prior notice and a prompt, subsequent opportunity to be heard. The lower court, therefore, opened Pandora's box by isolating its examination of Rule B(1) from the facts. At the same time, its unfortunate statement that Rule B(1) is constitutional, as applied, is rendered a *non-sequitur* by the disclosure that

---

**1.** Maritime property falls comfortably within    this exception.

other safeguards were not applied to the attachment proceeding.[2]

Nevertheless, the awkward approach below helps define the very narrow issue before this court: must an attachment of maritime property under Supplemental Rule B(1) for Admiralty be cloaked with the other procedural safeguards found essential in actions peculiar to the common law?

We think not. Here we are confronted not with legislation regulating procedure in land-based commercial transactions, but with a procedural rule promulgated by the Supreme Court providing for the attachment of maritime vessels, primarily for jurisdictional purposes.

Above all else, *Sniadach* and its progeny affirm that flexibility remains the most significant trait of procedural due process. In *Mitchell*, the Court reiterated its view that "the very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." 416 U.S. at 610, 94 S.Ct. at 1901 (*quoting Cafeteria Workers v. McElroy*, 367 U.S. 886, 895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1969)). Earlier, it found a garnishment of wages procedurally deficient only after balancing the creditor's desire to collect against the debtor's deprivation of income. *Sniadach*, 395 U.S. at 339, 89 S.Ct. at 1821.

Justice White's finding of a "constitutional accommodation of the conflicting interests of the parties," *Mitchell*, 416 U.S. at 610, 94 S.Ct. at 1901 (majority opinion), harks back to an approach suggested years earlier for procedural due process cases:

Due process is not a mechanical concept. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment...

*Joint Anit-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162–63, 71 S.Ct. 624, 643–44, 95 L.Ed. 817 (1951) (Frankfurter, J., concurring). The Supreme Court's continued recognition of this attribute clearly transcends whatever factual limitations these recent cases otherwise suggest.

Paradoxically, the most immutable characteristic of procedural due process is that it constantly changes. To impose specific procedures found essential in drastically different fact situations, as the lower court did, ignores the one precept that insulates procedural due process, like all other constitutional doctrines, from susceptibility to black letter law formulation. Accordingly, constitutional review of Rule B attachments is not governed by the unyielding guidelines promulgated in *Sniadach* and cases which followed. That approach simply does not hold water in the context of maritime commerce.

### Rule B Ground In Legal, Historical, and Practical Differences

We are not alone in withholding application of procedural due process guidelines established in other contexts to admiralty rules of procedure. The Ninth Circuit, as yet the only appellate court to address the issue, has already rejected constitutional attack on Rule B attachments.[3] *Polar Shipping, Ltd. v. Oriental Shipping Corp.*, 680 F.2d 627 (9th Cir.1982). The Fourth and Fifth Circuits seized upon the flexible nature of procedural due process to uphold the constitutionality of arrests of property pursuant to Rule C. *Amstar Corp. v. S/S Alexandros T.*, 664 F.2d 904 (4th Cir.1981); *Merchants National Bank v. General G.L. Gilespie*, 663 F.2d 1338 (5th Cir.1981).

Those decisions attack head on the complex question of the two Rule's facial con-

**2.** The court's extended focus on the critical absence of the three safeguards leads us to believe it did not mean what it shall. *Schiffahrtsgesellschaft*, 552 F.Supp. at 782–83.

**3.** The lower court's well researched opinion sets out the numerous district court decisions on the subject, concluding that the majority support Rule B in its present form. *Schiffahrtsgesellschaft*, 552 F.Supp. 778.

stitutionality.[4] Each court relied upon the distinct legal foundation of admiralty law, the historical application of the two procedures, and the transient nature of maritime property to scrutinize the procedural safeguards of Rules B and C under more lenient standards. While this court is concerned only with the absence of other procedural safeguards, we nonetheless find their analytical approach persuasive.

The framers considered admiralty jurisdiction so significant that they awarded Federal Courts the power to sit in Admiralty under a separate constitutional delegation. U.S. Const., art. III, § 2. The concept did not originate, however, with American jurisprudence. "Admiralty courts have been found necessary in all commercial countries, for the safety and convenience of commerce ..." *In re Louisville Underwriters*, 134 U.S. 488, 493, 10 S.Ct. 587, 589, 33 L.Ed. 991 (1890). The concerns of Admiralty obviously reach matters far removed from the common law.

The legacy of admiralty's legal heritage is the deep-rooted historical basis surrounding its procedural rules. Maritime attachments, dating back to our nation's fledgling days, preceded the promulgation of specific admiralty rules. *Manro v. Almeida*, 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369 (1825). Congress authorized the Supreme Court to develop such rules in 1792. It

reiterated the peculiar nature of admiralty law and instructed adherence to rules and usages of admiralty rather than those of common law courts. *Amstar*, 664 F.2d at 908. Rule B is a sterling example of the Court's respect for that advice. Its focus has changed little in 140 years. The practice was officially codified in 1844, and refined in 1920, as Admiralty Rule 2. With the addition of admiralty procedure as supplemental rules to the Federal Rules of Civil Procedure, it became Supplemental Rule B in 1966. According to the Advisory Committee charged with unifying admiralty and civil procedure, Rule B merely restates the traditional 19th Century attachment method. 7A J. Moore, *Moore's Federal Practice* § B.01[2] at B–12, 2d ed. (1981).[5]

Rule B's practical effect constitutes the most persuasive prong of this analytical approach. Traditional procedural due process analysis does not take place in a vacuum; relevant commercial and legal considerations provide the backdrop for review. *Merchants*, 663 F.2d at 1343.[6] In this regard, a ship's ability to dock, unload cargo, and fill its hold with goods intended for another destination—all within 24 hours—imposes tremendous pressure on creditors desiring to attach a vessel or property located aboard. "A ship may be here today and gone tomorrow...." *Polar Shipping*,

---

**4.** Those courts addressed the failure of Rules B and C to require either notice of any kind or a guaranteed prompt, post attachment hearing, as well as the necessity of additional safeguards. Our review is much more limited by comparison.

**5.** In *Grand Bahama Petroleum Co., Ltd. v. Canadian Transp., Ltd.*, 450 F.Supp. 447 (W.D.Wash. 1978), the seminal case denying the constitutionality of Rule B, the court asserted the rule has changed significantly since adoption of the Constitution. The two preferred grounds: (1) the defendant's presence in the district was originally determined by a marshal; (2) attachment issued on the strength of a court order. *Id.* at 459. We will deal with these contentions shortly. For the present, it serves our purposes to note that the court conceded the procedures have not changed since being streamlined in 1825. *Id.*

**6.** We are mindful that the Supreme Court, in its most recent review of procedural due process, concluded:

We are no more inclined now than we have been in the past to distinguish different kinds of property in applying the due process clause. *North Georgia Finishing*, 419 U.S. at 608, 95 S.Ct. at 723.

In our view, this admonition merely prohibits superficial distinctions between corporate, consumer, and other types of property. It does not, however, preclude meaningful review of a property's susceptibility to destruction, removal, or transfer, characteristics consistently given careful attention by the Court in evaluating a creditor's security interest. *See, e.g., Fuentes*, 407 U.S. at 93, 92 S.Ct. at 1983.

680 F.2d at 637. Worse yet, as the ship sails, so does the debtor.[7] The frustrated creditor, much like Evangeline,[8] the poor Acadian girl separated from her lover, is tragically left to roam the shores awaiting the debtor's next arrival.

Rule B is the harbinger of more happy endings. Its personal jurisdiction objective, unswervingly adhered to since this nation's origin, *Manro v. Almeida*, 23 U.S. at 487, 6 L.Ed. at 369, takes on added viability in the admiralty context. Merchants were long ago described as "shrewd, careful, familiar with the forms of business ... watchful [of] their own interests." *The David Pratt*, F.Cas. No. 3597 (D.C.Me.1839). Little has changed today. They rush to fly the nouveau flags of legal and financial safe harbors such as Liberia, Panama, and Argentina. Intricate corporate shells are employed to disguise the ownership of shipping assets. *Inter-American Shipping Enterprises, Ltd. v. Turbine Tanker T.U.L.A.*, 1982 A.M.C. 951 (Ed. Va.1981). It is reputed that they participate in petroleum black markets and willfully destroy outmoded, overinsured vessels.

In this atmosphere, Rule B restores order and attempts to protect the *creditor's rights*. It draws debtors from otherwise impenetrable fortresses. It commands a speedy clarification of vital facts underlying both prior disputes and the current seizure. It compels adjudication. *Polar Shipping*, 680 F.2d at 629–30. Otherwise, pursuit of such unresolvable disputes, as the Court long ago acknowledged, "would in many cases amount to a denial of justice." *In re Louisville Underwriters*, 134 U.S. at 493, 10 S.Ct. at 589.

### Other Safeguards Unnecessary Under Rule B

Satisfied that the circumstances overwhelmingly support a lenient review of Rule B's procedural guidelines, we turn to its silence as to other procedural safeguards. The three alleged shortcomings are the failure to require: (1) posting of bond by the plaintiff; (2) complaints, stated with particularity, based upon personal knowledge, and (3) prior judicial evaluation of the claim. In rejecting these contentions, the wisdom of taking cognizance of Rule B's historical, legal, and practical differences becomes evident.

First, while the plaintiff need not post bond prior to execution, Supplemental Rule E(7) arms the defendant with the power to compel bond on any counterclaim it files. Additionally, provision (2) of Rule E enables the defendant to recover its costs in defending a wrongfully instituted attachment proceeding. These protective measures preclude the necessity of this safeguard.

Second, the sufficiency of the complaint cannot be seriously questioned. Admiralty Rule E(2)(a), which parallels F.R.C.P. Rule 8(a), requires the complaint to state factual circumstances with enough particularity to enable formulation of a response. Admittedly, attorneys in these cases often rely on the hearsay statements of others. *Grand Bahamas*, 450 F.Supp. at 458. This criticism ignores the transient nature of the property and the jurisdictional goals involved. It would be unduly burdensome to impose rigid pleading technicalities when the creditor and its attorneys have only 24 hours—the time in which a ship may get in and out of port—to communicate the facts to each other and then hurriedly contact local counsel.

The lower court conceded this point; it instead criticized the information and belief standard, which governs the attorney's affidavit that the defendant cannot be found in the district, as meaningless. It is rare, however, that a foreign shipper will be

---

**7.** Significantly, creditors in common law actions can still avail themselves of *in personam* causes of action. *Cf. Sniadach*, 395 U.S. at 339, 89 S.Ct. at 1821. We take note of our inability to extend similar consolation to the appellant in this case.

**8.** Longfellow, "Evangeline, A Tale of Acadie," (1843).

found in the district due to the global nature of maritime shipping and modern communication technology. The growth of P & I (Protection and Indemnity) Clubs, with correspondents in every port of call, eliminates the need for a ship owner's direct involvement in local disputes. Furthermore, a debtor residing in the district will likely have an office in the port city. Attorneys operating under the information and belief approach are unquestionably required to undertake a telephone or city directory search.

Third, the policy considerations prompting endorsement of judicial participation do not apply in factually confusing admiralty disputes arising out of occurrences on the high seas or in other parts of the globe. Its usefulness is limited to screening claims whose validity can be discerned from examining purchase contracts and credit agreements. To impose this requirement blindly would only produce "more legal boiler plate." *Polar Shipping*, 680 F.2d at 639. We likewise agree with the refreshing comments of another court recently addressing this issue:

> It would be unfortunate, indeed, if for the sake of theoretical uniformity standardized concepts of procedural due process were compelled to be followed in and superimposed on all cases including admiralty.

*Parcel Tankers, Inc. v. Formosa Plastics Corp.*, 569 F.Supp. 1459, 1465 (S.D.Tex. 1983).

The Fifth Circuit, in rejecting arguments for judicial participation under Rule C, questioned a judge's or magistrate's ability to review complicated transactions and instantaneously determine the ultimate enforceability of a maritime lien. It focused upon the *lienor's* due process rights,[9] noting that denial of a seizure would in essence dispose of the claim without trial.

---

**9.** This concern is a natural by-product of a truly flexible approach. It comports with the Supreme Court's realistic assessment of such disputes:

*Merchants*, 663 F.2d at 1344. This rationale applies with equal force to Rule B, which injects far more confusing facts since the claims are based on prior disputes occurring in other jurisdictions. The erroneous attachment in the present dispute is instructive on the issue of meaningful judicial participation. Since the appellant proceeded pursuant to information contained in *Lloyd's Register*, the intervening change in ownership would not have been brought out in an *ex parte* proceeding.

## CONCLUSION

■ Since 1844 Admiralty Rules of Procedure have had but one author: the United States Supreme Court. Their lineage sets them apart from common law based sequestration, garnishment, and attachment laws developed by the legislatures of the several states. As offspring of the very institution charged with mandating the procedural safeguards required before property may be taken, Supplemental Rules for Admiralty must be reviewed with special deference.

■ Because it is clear beyond peradventure that appellee was accorded the procedural due process to which it was entitled, the lower court erroneously proceeded to a determination of the facial constitutionality of Rule B(1). Accordingly, its judgment is:

**REVERSED and REMANDED.**

> [We] must take into account not only the interests of the buyer of the property but those of the seller as well.
> *Mitchell*, 416 U.S. at 604, 94 S.Ct. at 1898.