SCHIFFAHARTSGESELLSCHAFT LEONHARDT & CO.,
Plaintiff-Appellant,

v.

A. BOTTACCHI S.A. DE NAVEGACION,
Defendant-Appellee.

No. 83–8019.

United States Court of Appeals,
Eleventh Circuit.

Oct. 1, 1985.

Robert S. Glenn, Jr., Savannah, Ga., for plaintiff-appellant.

Lamar Walter, Savannah, Ga., for defendant-appellee.

Theodore A. LeGros, Seattle, Wash., David R. Owen, Baltimore, Md., for amicus curiae, Maritime Law Ass'n of U.S.

Before GODBOLD, Chief Judge, RONEY, TJOFLAT, HILL, FAY, VANCE, KRAVITCH, JOHNSON, HENDERSON, HATCHETT, ANDERSON and CLARK, Circuit Judges.

TJOFLAT, Circuit Judge:

I.

On May 25, 1982 the clerk of the U.S. District Court for the Southern District of Georgia issued a writ of attachment against bunkers and stores owned by the appellee, A. Bottacchi S.A. de Navegacion ("Bottacchi"), and located aboard the vessel M/V *Puntas Malvinas.* The writ was sought by the appellant, Schiffahartsgesellschaft Leonhardt & Co. (G.M.B.H. & Co.) ("Leonhardt"). This appeal questions the constitutionality of the maritime attachment procedures employed by the district court.

Bottacchi, an Argentine corporation, time-chartered[1] the M/V *Barbara Leonhardt* from Leonhardt pursuant to a New York Produce Exchange charter party dated March 26, 1982.[2] On or about April 14, 1982, while operating under the charter party on a voyage from St. Johns, Canada, to Buenos Aires, Argentina, the M/V *Barbara Leonhardt* and her cargo were damaged, allegedly as a result of Bottacchi's negligence, during heavy weather. Upon arrival of the vessel in Buenos Aires, Leonhardt was required to post security of $450,000 in favor of various cargo interests to avoid arrest of the ship. Alleging that it was entitled to indemnity or contribution from Bottacchi for any damages it might be adjudged to owe the cargo interests, Leonhardt, on May 24, 1982, filed a complaint in admiralty, and petition to compel arbitration, in the Southern District of Georgia and sought the issuance of a sum-

---

1. A time charter is a contract under which the owner lets the use of the ship to another person for a specified period. The owner continues to operate the vessel and contracts to render the services of his master and crew to carry goods loaded on the ship.

2. Clause 17 of the charter party provided that any disputes arising between the owners and charterers should be submitted to arbitration in London.

mons with process of attachment against the M/V *Puntas Malvinas*, which was docked in Savannah, Georgia, and was listed in the most recent supplement of *Lloyd's Register of Shipping* as being owned by Bottacchi. In accordance with Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure ("Rule B(1)"), Leonhardt's attorney verified the complaint since none of Leonhardt's officers were present in the district. In addition, pursuant to Rule B(1) the lawyer also submitted an affidavit that to the best of his belief Bottacchi could not be found within the district.

Although Bottacchi was listed in *Lloyd's Register* as the owner of the vessel, documents presented by Bottacchi's attorney the following day revealed that Bottacchi did not own the vessel [3] but rather operated under a bareboat charter.[4] Under this arrangement Bottacchi owned only certain bunkers and stores aboard the ship. Leonhardt immediately amended its complaint and prayed for issuance of process of attachment against the bunkers and stores. On May 25, 1982, the clerk of court ordered the U.S. Marshal to initiate process. Before executing the writ of attachment, the marshal had notified the ship's local husbanding agent of the impending seizure. The agent immediately contacted the attorney in Savannah who represented Bottacchi's interests. Bottacchi, pursuant to Supplemental Rule E(5), effectuated an immediate release of the property after posting security for Leonhardt's claims.

On May 26, 1982, the district court convened to hear Bottacchi's objections to the attachment. Bottacchi at this time argued that Rule B(1) violated due process in failing to provide adequate judicial supervision of the attachment process and that, because the rule constituted the sole authority for the court's issuance of the writ, the writ had to be dissolved. Upon hearing this objection, the court directed Bottacchi to incorporate the objection in a formal motion, and on June 4, 1982, Bottacchi moved the court, pursuant to Supplemental Rule E(8), to dismiss the complaint and quash the process of attachment. The court heard the motion on July 22, 1982. Noting that Bottacchi not only had preseizure notice but also enjoyed an immediate postseizure hearing, the court found that Bottacchi had been accorded due process under the circumstances.[5] The court, however, proceeded to hold Rule B(1) invalid under the due process clause, citing the Supreme Court's decision in *Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969), and a line of similar cases. The constitutional deficiency resulted from the absence of: (1) procedural safeguards in place of preseizure notice and hearing; and (2) a prompt postattachment hearing. *Schiffahartsgesellschaft Leonhardt & Co. v. A. Bottacchi S.A. de Navegacion*, 552 F.Supp. 771, 781–84 (S.D.Ga.1982).

On May 29, 1984, a panel of this court reversed the district court. 732 F.2d 1543 (11th Cir.1984). The panel held that because Bottacchi was accorded due process in the particular case, the lower court erred in proceeding to determine the facial constitutionality of Rule B(1). *Id.* at 1549. We have taken the case en banc to address the confusion that appears to have arisen in the district courts over the relationship between Rule B(1) and the courts' inherent

---

**3.** The vessel was actually owned by Angel Louis Maria Bottacchi.

**4.** Under this arrangement the charterer (here, Bottacchi) leases the vessel, takes control of the ship, and supplies the crew. We note that the creation of a corporate shell to charter a vessel insulates the actual owner from liability and thereby neatly avoids any possibility of the ship being attached by the corporation's creditors.

**5.** Actually, the court held that Bottacchi had been accorded due process under Rule B(1) "as applied." The court went on, however, to hold Rule B(1) facially unconstitutional as violative of due process. Since logic precludes a court from holding a statute facially unconstitutional and yet constitutional as applied, we read the district court as having dissolved the writ on the theory that, without a valid attachment rule, the court lacked the power to issue the writ. Thus, the fact that under the circumstances Bottacchi had received full due process was of no moment.

admiralty powers. The court below, as have others,[6] viewed too narrowly its traditional maritime powers and, believing that its sole authority to issue a writ of attachment derived from Rule B(1), found it necessary to pass on the facial constitutionality of the rule. We find that the district courts should take a more expansive view of their power to fashion admiralty procedures and that, as a result, the constitutionality of Rule B(1) need not, and should not, be reached.

## II.

We note at the outset that, if the district court had the power to issue the writ of attachment independent of its authority derived under Rule B(1), a finding that Bottacchi was accorded due process would make a ruling on the facial constitutionality of Rule B(1) unnecessary and therefore unwarranted. We conclude that the district court had such power.

The Constitution established a separate jurisdictional base in the federal courts for admiralty cases in article III, section 2, clause 1,[7] which extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction."[8] This grant of jurisdiction implies the adoption of the then existing maritime law as the law of the United States:

As there could be no cases of "admiralty and maritime jurisdiction," in the absence of some maritime law under which they could arise, the provision presupposes the existence in the United States of a law of that character. Such a law or system of law existed in colonial times and during the Confederation, and commonly was applied in the adjudication of admiralty and maritime cases. It embodied the principles of the general maritime law, sometimes called the law of the sea, with modifications and supplements adjusting it to conditions and needs on this side of the Atlantic. The framers of the Constitution were familiar with that system and proceeded with it in mind. Their purpose was not to strike down or abrogate the system, but to place the entire subject—its substantive as well as its procedural features—under national control, because of its intimate relation to navigation and to interstate and foreign commerce. In pursuance of that purpose the constitutional provision was framed and adopted.... After the Constitution went into effect, the substantive law theretofore in force was not regarded as superseded or as being only the law of the several states, but as having become the law of the United States....

*Panama Railroad v. Johnson,* 264 U.S. 375, 385–86, 44 S.Ct. 391, 393, 68 L.Ed. 748 (1924). Congress, however, retained the power to alter substantive and procedural maritime rules:[9] "When the Constitution

---

6. *See Crysen Shipping Co. v. Bona Shipping Co.,* 553 F.Supp. 139 (M.D.Fla.1982); *Cooper Shipping v. Century 21,* 1983 A.M.C. 244 (M.D.Fla. 1982).

7. The grant extends to the "supreme Court, and ... such inferior Courts as the Congress may from time to time ordain and establish." Art. III, § 1.

8. Congress implemented this constitutional grant in the Judiciary Act of 1789, ch. 20, § 9, 1 Stat. 76, 76–77. This provision is currently codified at 28 U.S.C. § 1333 (1982).

9. This proposition was reiterated by the Supreme Court in *Romero v. International Terminal Operating Co.,* 358 U.S. 354, 360–61, 79 S.Ct. 468, 474, 3 L.Ed.2d 368 (1959):

  Article III, § 2, cl. 1 (3d provision) of the Constitution and section 9 of the Act of September 24, 1789, have from the beginning been the sources of jurisdiction in litigation based upon federal maritime law. Article III impliedly contained three grants. (1) It empowered Congress to confer admiralty and maritime jurisdiction on the "Tribunals inferior to the Supreme Court" which were authorized by Art. I, § 8, cl. 9. (2) It empowered the federal courts in their exercise of the admiralty and maritime jurisdiction which had been conferred on them, to draw on the substantive law "inherent in the admiralty and maritime jurisdiction," ... and to continue the development of this law within constitutional limits. (3) It empowered Congress to revise and supplement the maritime law within the limits of the Constitution.

  (Citations omitted.)

  Although Congress has broad power to modify maritime law, that power is itself circumscribed by the Constitution. Congress may not legislate beyond the constitutional limits inherent in the maritime jurisdiction:

was adopted, the existing maritime law became the law of the United States 'subject to power in Congress to alter, qualify or supplement it as experience or changing conditions might require.' " *Detroit Trust Co. v. Barlum S.S. Co.*, 293 U.S. 21, 43, 55 S.Ct. 31, 38, 79 L.Ed. 176 (1934) (quoting *Panama Railroad*, 264 U.S. at 386, 44 S.Ct. at 393).[10] Federal courts, then, are empowered to apply maritime procedure and law as it existed at the time of the Constitution's adoption, with such modifications as changing needs and circumstances require,[11] subject to congressional alteration of that law.

The Supreme Court in *Manro v. Almeida*, 23 U.S. (10 Wheat.) 473, 6 L.Ed. 369 (1825), held that maritime attachment was a part of American jurisprudence at the time the Constitution was adopted. Manro sought to recover for funds wrongfully taken by Almeida while on board a ship off the Capes of the Chesapeake. Almeida left the country and a writ of attachment was issued against certain of his property. The district court dismissed Manro's libel on the demurrer of Almeida and restored the goods attached. The Supreme Court, on appeal, limited its inquiry to "whether the

court below erred in refusing to the libellant the process of attachment on the case made out in his libel." 23 U.S. (10 Wheat.) at 484. The central issue before the Court was whether the remedy of attachment was available in admiralty to require the presence of a respondent located outside the court's jurisdiction. 23 U.S. (10 Wheat.) at 487–88.

In answering the question in the affirmative, the Court reviewed the history of attachment in American admiralty law in light of the Process Act of 1789,[12] which required federal courts to apply civil rather than common law [13] in maritime cases, and the Process Act of 1792,[14] which directed courts to employ procedures "according to the principles, rules and usages, which belong to courts of admiralty, as contradistinguished from courts of common law." *See* 23 U.S. (10 Wheat.) at 487–92. The Court concluded that attachment was clearly established in American admiralty law and reversed the lower court:

> Upon the whole, we are of opinion, that for a maritime trespass, even though it savors of piracy, the person injured may have his action *in person-*

[T]here are [congressional] limitations which have come to be well recognized. One is that there are boundaries to the maritime law and admiralty jurisdiction which inhere in those subjects and cannot be altered by legislation, as by excluding a thing falling clearly within them or including a thing falling clearly without. Another is that the spirit and purpose of the constitutional provision require that the enactments—when not relating to matters whose existence or influence is confined to a more restricted field ...—shall be coextensive with and operate uniformly in the whole of the United States.

*Panama Railroad v. Johnson*, 264 U.S. 375, 386–87, 44 S.Ct. 391, 394, 68 L.Ed. 748 (1924) (citations omitted). *See* 1 E. Jhirad, A. Sann & B. Chase, Benedict on Admiralty § 110 (7th ed. 1983); *see also O'Donnell v. Great Lakes Dredge & Dock Co.*, 318 U.S. 36, 40–43, 63 S.Ct. 488, 491–92, 87 L.Ed. 596 (1943); *Pryor v. American President Lines*, 520 F.2d 974, 977 (4th Cir.1975), *cert. denied*, 423 U.S. 1055, 96 S.Ct. 787, 46 L.Ed.2d 644 (1976).

**10.** Constitutional authority for Congress to modify maritime law derives from its authority to regulate commerce under art. I, § 8, cl. 3, and its power to make laws which shall be necessary and proper to carry into execution powers vest-

ed by the Constitution in the government or any department of it. Art. I, § 8, cl. 18. *See* 1 E. Jhirad, A. Sann & B. Chase, Benedict on Admiralty § 109 (7th ed. 1983).

**11.** *See* G. Gilmore & C. Black, The Law of Admiralty 47 (2d ed. 1975).

**12.** Act of Sept. 29, 1789, ch. 21, § 2, 1 Stat. 93.

**13.** Unlike common law, the history of admiralty law is one of codification. For a brief history of these codes, from the tablets of Amalfi to the Rules of Oleron, *see* G. Gilmore & C. Black, The Law of Admiralty 5–6 (2d ed. 1975). As codified law, admiralty became associated with the work of continental legal scholars who were modernizing the Roman or "civil" law. "Maritime law thus grew up and came of age under the tutelage of the civil law, and it still bears the imprint thus acquired, even when administered in the courts of common law countries." *Id.* at 8. Thus the Process Act of 1789, in mandating the application of civil law, required only that courts look to the traditional sources of maritime law.

**14.** Act of May 8, 1792, ch. 36, § 2, 1 Stat. 276.

*am,* and compel appearance by the process of attachment on the goods of the trespasser, according to the forms of the civil law, as engrafted upon the admiralty practice. And we think it indispensable to the purposes of justice, and the due exercise of the admiralty jurisdiction, that the remedy should be applied, even in cases where the same goods may have been attachable under the process of foreign attachment issuing from the common-law courts.

23 U.S. (10 Wheat.) at 495–96. *See also Grand Bahama Petroleum Co. v. Canadian Transportation Agencies, Ltd.,* 450 F.Supp. 447, 453 (W.D.Wash.1978).

In 1842 Congress empowered the Supreme Court to promulgate maritime rules,[15] the first set of which was adopted by the Court in 1844. Rule 2 of the former Rules of Practice for Admiralty and Maritime Cases provided for attachment when the defendant could not be located within the district.[16] Although the Rules of 1844 were superseded by the Admiralty Rules of 1920, no substantial change was made in Rule 2. Current Rule B(1) is modeled after Rule 2 and was intended to preserve the essential elements of Rule 2.[17] These rules promulgated by the Supreme Court and enacted by Congress constitute the only statutory restrictions on maritime attachment placed on a federal district court's power to apply admiralty law and procedure. Clearly, however, these rules were not intended to be the exclusive source of maritime procedure available to the courts:

> No attempt is here made to compile a complete and self-contained code governing these distinctively maritime remedies. The more limited objective is to carry forward the relevant provisions of

the former Rules of Practice for Admiralty and Maritime Cases, modernized and revised to some extent but still in the context of history and precedent. Accordingly, these Rules are not to be construed as limiting or impairing the traditional power of a district court, exercising the admiralty and maritime jurisdiction, to adapt its procedures and its remedies in the individual case, consistently with these rules, to secure the just, speedy, and inexpensive determination of every action.

Supplemental Rule A advisory committee note.

■ We view the procedures employed in the present case, including the postattachment hearing, as entirely consistent with Rule B(1). For this reason we find that the court had the authority, under its inherent power to apply traditional maritime law, to issue the writ of attachment; it need not have relied on any grant of authority under Rule B(1). We therefore must dispose of the case before us by examining fifth amendment procedural due process in light of the procedures utilized by the district court.

### III.

#### A.

In *Sniadach* the Court struck down a Wisconsin garnishment statute which "as a practical matter [drove] a wage-earning family to the wall." 395 U.S. at 341–42, 89 S.Ct. at 1823. In this "most inhumane" setting Justice Douglas, speaking for the Court, quickly concluded that the failure to provide a prejudgment garnishment hearing violated the wage earner's procedural due process rights. 395 U.S. at 342, 89 S.Ct. at 1823.

---

**15.** Act of Aug. 23, 1842, ch. 188, § 6, 5 Stat. 518 (codified as amended in 28 *U.S.C.* § 2072 (1982)).

**16.** Rule 2 provided that:
In suits *in personam,* the mesne process may be by a simple warrant of arrest of the person of the defendant, in the nature of a capias, or by a warrant of arrest of the person of the defendant, with a clause therein, that if he cannot be found, to attach his goods and chattels to the amount sued for; or if such

property can not be found, to attach his credits and effects to the amount sued for in the hands of the garnishees named therein; or by a simple monition, in the nature of a summons to appear and answer to the suit, as the libellant shall, in his libel or information, pray for or elect.
*Reprinted in* 7A J. Moore & A. Pelaez, Moore's Federal Practice ¶ .30, at 224 (2d ed. 1983).

**17.** *See* Supplemental Rule B advisory committee note.

Three years later the Court, in *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), reaffirmed the general need for notice and an opportunity for a hearing prior to depriving an individual of a significant property interest. The Court struck down Pennsylvania and Florida statutes providing for the issuance of a writ of replevin on an *ex parte* application, accompanied by a security bond.[18] The case arose in a consumer financing context. Common sense dictates that due process requirements involving essentials such as wages and important consumer goods[19] cannot be automatically imposed on maritime transactions.

Two years after *Fuentes*, the Court in *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974), upheld a Louisiana sequestration statute which did not require preseizure notice or hearing. In its decision, which Justice Powell in concurrence described as a withdrawal from the broad principles articulated in prior cases, *id.* at 623, 94 S.Ct. at 1908, the Court refused woodenly to apply due process requirements to the situation before it. Rather, it engaged in a balancing analysis in which the rights of a seller of personal property under a conditional sales contract were weighed against those of a buyer in default. *Id.* at 608–09, 94 S.Ct. at 1900–01. In this case, as required by statute, the sequestration was ordered by a judge upon the filing of a verified complaint by the creditor. In addition, the vendor was required to post bond. The court held a hearing on the debtor's motion to dissolve the writ of sequestration five weeks after it was executed. Stressing the possibility that the buyer upon notification of the proceeding might destroy or sell the property, the Supreme Court upheld the statute. It further noted that "[t]he usual rule has been '[w]here only property rights are involved, mere postponement of the judicial inquiry is not a denial of due process, if the opportunity for ultimate judicial determination of liability is adequate.'" *Id.* at 611, 94 S.Ct. at 1902 (quoting *Phillips v. Commissioner*, 283 U.S. 589, 596–97, 51 S.Ct. 608, 611, 75 L.Ed. 1289 (1931)). In light of the other safeguards required by the statute, the Court found that the sequestration provided procedural due process even in the absence of presequestration notice or hearing.

Finally, in *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), the Court struck down a Georgia garnishment statute. Under the statute the writ of garnishment was issuable by the clerk upon the receipt of an affidavit by the creditor. The affidavit had only to contain conclusory allegations. Further, the statute failed to provide an early postgarnishment hearing.

This Supreme Court tetralogy defines the limits of procedural due process in a consumer context. With the exception of *North Georgia Finishing*, which involved a corporate bank account, the cases dealt with the attachment of wages or essential household goods, a situation clearly distinguishable from the intricacies of admiralty operations.[20] Maritime needs and require-

---

**18.** The Court did note that there were certain unusual or "extraordinary" situations where preseizure notice and an opportunity to be heard might not be necessary. These cases share three common elements:

> First, in each case, the seizure has been directly necessary to secure an important governmental or general public interest. Second, there has been a special need for very prompt action. Third, the State has kept strict control over its monopoly of legitimate force: the person initiating the seizure has been a government official responsible for determining, under the standards of a narrowly drawn statute, that it was necessary and justified in the particular instance.

*Fuentes v. Shevin*, 407 U.S. 67, 91, 92 S.Ct. 1983, 2000, 32 L.Ed.2d 556 (1972). Attachment under Rule B(1), however, clearly meets none of these requirements. *See Grand Bahama Petroleum Co. v. Canadian Transportation Agencies, Ltd.*, 450 F.Supp. 447, 457 (W.D.Wash.1978).

**19.** At issue in *Fuentes* was the repossession of a stove, a stereo, a bed, a table, and other household goods.

**20.** Another important difference between admiralty attachment and the procedure in question in *North Georgia Finishing, Inc. v. Di-Chem*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975), is that in *North Georgia Finishing*, jurisdiction over the defendant was not obtained by the attachment. Obtaining jurisdiction over the

ments differ substantially from those in the commercial context in which *North Georgia Finishing* arose. The issue, then, is whether due process is flexible enough to accommodate these differences.

### B.

Due process requires at a minimum adequate notice and the opportunity to be heard. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313, 70 S.Ct. 652, 656–57, 94 L.Ed. 865 (1950). These requirements, however, are the result of particular needs in particular contexts; they resist mechanical application. As Justice Frankfurter wrote in *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 162–63, 71 S.Ct. 624, 643–44, 95 L.Ed. 817 (1951) (concurring):

> "[D]ue process" is compounded of history, reason, [and the] past course of decisions.... Due process is not a mechanical instrument. It is not a yardstick. It is a process. It is a delicate process of adjustment inescapably involving the exercise of judgment by those whom the Constitution entrusted with the unfolding of the process.
>
> . . . .
>
> The Court has responded to the infinite variety and perplexity of the tasks of government by recognizing that what is unfair in one situation may be fair in another.

Even when setting the parameters of due process in the *Sniadach* line of cases, the Court acknowledged that:

> The requirements of due process of law "are not technical, nor is any particular form of procedure necessary." Due process of law guarantees "no particular form of procedure; it protects substantial rights." "The very nature of due process negates any concept of inflexible procedures universally applicable to any imaginable situation."

*Mitchell v. W.T. Grant Co.*, 416 U.S. at 610, 94 S.Ct. at 1901 (citations omitted). With this in mind, we turn to an examination of the distinctive nature of admiralty

and the requirements of due process in a maritime context.

Admiralty law exists because man sails the seas. And while en route, he has encountered difficulties unique to the nautical world. In response to these problems, a body of maritime law has emerged. These rules are products of ports and shipping lanes, addressing the special needs which arise there.

■ As we noted earlier, admiralty is a separate body of substantive and procedural law, distinct from common law. Uniquely maritime concepts prove the point. The maritime lien is "peculiar to the law of admiralty without a clearly analogous counterpart in the traditional land-based common law of liens." *Bethlehem Steel Corp. v. S/T Valiant King*, 1977 AMC 1719, 1722 (E.D.Pa.1974). *See also* G. Gilmore & C. Black, The Law of Admiralty 586–89 (2d ed. 1975). Limitation of liability, a statutory scheme,[21] permits a ship owner to limit his liability in certain situations to the value of his vessel or his freight. The law of general average requires all participants in a venture to contribute to various losses in proportion to their interests, regardless of fault. *See* G. Gilmore & C. Black, *supra*, at 818–957. Finally, the principle of salvage rewards a salvor of property in peril with a maritime lien in that property in an attempt to induce rescue. *Id.* at 532–85. It is in this distinct realm of admiralty that the due process ramifications of attachment proceedings must be examined.

■ Maritime attachment is designed to assure a defendant's appearance and to secure satisfaction if the suit is successful. *Swift & Co. Packers v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 693, 70 S.Ct. 861, 867, 94 L.Ed. 1206 (1950). The Supreme Court has acknowledged the need for such a procedure in admiralty:

> Courts in admiralty are established for the settlement of disputes between persons engaged in commerce and naviga-

---

debtor is a primary objective of maritime attachment.

**21.** 46 U.S.C. §§ 181–189 (1982).

tion, who, on the one hand, may be absent from their homes for long periods of time, and, on the other hand, often have property or credits in other places. In all nations, as observed by an early writer, such courts "have been directed to proceed at such times, and in such manner, as might best consist with the opportunities of trade, and least hinder or detain men from their employments." ... To compel suitors in admiralty, when a ship is abroad and cannot be reached by a libel *in rem*, to resort to the home of the defendant, and to prevent them from suing him in any district in which he might be served with a summons or his goods or credits attached, would not only often put them to great delay, inconvenience, and expense, but would in many cases amount to a denial of justice.

*In re Louisville Underwriters*, 134 U.S. 488, 493, 10 S.Ct. 587, 589, 33 L.Ed. 991 (1890) (citation omitted). For this reason, courts have rejected claims that use of attachment procedures to obtain *quasi in rem* jurisdiction violates substantive due process as enunciated in *Shaffer v. Heitner*, 433 U.S. 186, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977).[22] *See Trans-Asiatic Oil, Ltd. v. Apex Oil Co.*, 743 F.2d 956, 958–60 (1st Cir.1984); *Amoco Overseas Oil Co. v. Compagnie Nationale Algerienne de Navigation*, 605 F.2d 648, 654–55 (2d Cir.1979); *Grand Bahama Petroleum Co.*, 450 F.Supp. at 451–53.

In applying the concept of procedural due process to maritime attachment,[23] we must always be aware of the expectations and needs of all parties concerned. Merchants engaging in maritime commerce

"must reasonably expect to be sued where their property may be found." *Amoco Overseas Oil Co.*, 605 F.2d at 655. To protect themselves they often join protection and indemnity associations ("P & I Clubs"), organizations of shipowners, charterers, and other maritime entities which provide liability and defense coverage for their members. Most P & I Clubs have commercial correspondents in every major port in the world.[24] *See generally* Reynardson, *The History and Development of P & I Insurance: The British Scene*, 43 Tul.L.Rev. 457 (1969). In addition, when security is required to release a ship from attachment or arrest, underwriters are equipped to provide a letter of undertaking which pledges their assets to the payment of the claim. As the Maritime Law Association notes in its *Amicus* brief, such letters are generally accepted by the plaintiffs and, in the absence of such acceptance, underwriters utilize established relations with surety companies qualified in the attachment court to post formal bonds.[25] *See generally* Meredith, *Fines, Penalties, and Other Miscellaneous Liabilities; Expenses of Defense; General Conditions and Exclusions; Grounds for Cancellation; Second Seaman's Policy; Club Letters of Guarantee or Undertaking*, 43 Tul. L.Rev. 602, 612–14 (1969).

■ These are protections simply not available to the sort of defendants involved in the *Sniadach* line of cases. This difference alone must be a critical factor in determining the procedural process due a maritime merchant in an attachment proceeding.

---

**22.** Bottacchi advances no such claim in this case. We note an inconsistency in the analysis of courts which find the substantive due process rationale of *Shaffer* inapplicable to maritime attachment and yet proceed rigidly to impose the procedural due process requirements of the *Sniadach* line of cases. *See, e.g., Grand Bahama Petroleum Co.*, 450 F.Supp. at 452. In our view, flexibility in one component of due process counsels flexibility in the other.

**23.** We attach no significance to the fact that this case involves the due process clause of the fifth rather than the fourteenth amendment as was the case in *Sniadach* and its progeny.

**24.** The facts in this case illustrate this commercial practice. When the U.S. Marshal notified the local agents for the M/V *Puntas Malvinas* that she was about to be attached, the agents contacted the local counsel for the P & I club in which the vessel was a member. Bottacchi had admiralty counsel to protect its interests even before the vessel was attached.

**25.** Brief of *Amicus* at 12. We note that in the present case security was posted for the claim and the ship was released on May 26, 1982, one day after the writ of attachment issued.

In *Fuentes,* the Supreme Court noted that due process does not require preattachment notice where the "attachment [is] necessary to secure jurisdiction." 407 U.S. at 91 n. 23, 92 S.Ct. at 1999 n. 23 (1972). The Court was clearly concerned that upon learning of the pending proceedings the defendant might remove his property from the jurisdiction of the court. This possibility is ever-present in admiralty.

> The need to attach now and notify later is as great now as it ever was, if not greater. A ship can quietly slip its moorings and depart the jurisdiction. It can easily take with it such tangible property as may be within the jurisdiction. And credits can be quickly transferred elsewhere.

*Polar Shipping, Ltd. v. Oriental Shipping Corp.,* 680 F.2d 627, 637 (9th Cir.1982). *See also Trans-Asiatic Oil, Ltd.,* 743 F.2d at 962; *Amstar Corp. v. S/S Alexandros T.,* 664 F.2d 904, 911 (4th Cir.1981). We see no reason to interpret due process as requiring that the defendant be given time to escape the jurisdiction of the court.[26]

Bottacchi claims that the writ of attachment was issued on the basis of conclusory allegations in Leonhardt's complaint. We disagree. Supplemental Rule E(2)(a) requires that a plaintiff seeking a writ of attachment "state the circumstances from which the claim arises with such particularity that the defendant or claimant will be able, without moving for a more definite statement, to commence an investigation of the facts and to frame a responsive pleading." Clearly the complaint was sufficient for due process purposes. While it is true that the complaint may have been based on hearsay, *see Grand Bahama Petroleum Co.,* 450 F.Supp. at 458, temporal realities required that this be so. Time is of the essence in maritime attachment, and it would be unrealistic to require a creditor's lawyer, who often verifies the complaint, to undertake an independent investigation to gain first-hand knowledge of the situation before the ship is once again at sea. Due process cannot require the impossible.

Rule B(1) also requires an affidavit, verified by either the creditor or his lawyer, that to the best of his knowledge the defendant cannot be located within the district. The lower court found such an affidavit based on information and belief meaningless without an account of the ways in which the defendant was sought. *Schiffahartsgesellschaft,* 552 F.Supp. at 782–83. As the panel observed, however,

> It is rare, ... that a foreign shipper will be found in the district due to the global nature of maritime shipping and modern communication technology. The growth of P & I (Property and Indemnity) Clubs, with correspondents in every port of call, eliminates the need for a ship owner's direct involvement in local disputes. Furthermore, a debtor residing in the district will likely have an office in the port city. Attorneys operating under the information and belief approach are unquestionably required to undertake a telephone or city directory search.

*Schiffahartsgesellschaft,* 732 F.2d at 1548–49. Requiring language in the affidavit to the effect that the affiant has contacted the office of the Secretary of State and checked local telephone listings would only result in "more legal boiler plate." *Polar Shipping,* 680 F.2d at 639. It would provide little additional procedural protection to the defendant.

The preattachment posting of a bond by the creditor was, and is not practical and would, again, have provided the debtor little added protection against improper attachment. Certain types of bonds are already provided for in the Rules. Under Supplemental Rule E(2)(b) the court may require the creditor to post security for costs. In addition, under Rule E(7), if a defendant is willing to go on record that he may suffer damages from an unlawful attachment of his vessel and files a counterclaim and gives security for the plaintiff's claim, the court can order counter-security. Calculation of a preattachment bond, however, would be extremely difficult. If the

---

**26.** As we stated earlier, although Bottacchi did not receive judicial notice of the impending attachment, it was made aware of the situation by a U.S. Marshal.

security were based upon what is attached, a ship, bank account, or debt, how is the creditor to know the property's value? *See Polar Shipping*, 680 F.2d at 641. The amount of the bond would be equally indeterminable if it were based upon injuries sustained by the debtor as a result of the attachment. Finally, if the bond were to be set at the amount of the debt owed to the creditor, it would provide little deterrent for false claims since in almost all cases in which ships are attached the debt owed is but a fraction of the cost of the vessel. For these reasons, we find that procedural due process does not require the posting of a preattachment bond.

Finally, a preattachment *ex parte* hearing and judicial issuance of the writ of attachment would prove an ineffective tool to discern wrongful attachments; we, therefore, decline to find it required by the fifth amendment. As this case readily demonstrates,[27] ownership interests in shipping often are shrouded by a tangled web of legal interests whose identities are impossible for a judge to discern within the time frame in which writs of attachments must issue. *See Polar Shipping*, 680 F.2d at 639. Requiring a judge to play a corporate shell game may in the long run be unfair to the creditor:

> It is questionable whether a judge or magistrate on a pre-arrest basis could fairly consider complicated transactions bearing on the ultimate enforcement of the asserted maritime lien. A denial of the seizure might effectively dispose of the claim on the merits without trial.

27. Leonhardt's mistaken belief that Bottacchi was the owner of the vessel derived from misinformation supplied by *Lloyd's Register*. The true owner of the ship would not have been identified in an *ex parte* hearing before a judge.

28. Although there are substantive differences between Rule B(1) attachments and Supplemental Rule C seizures or arrests, procedurally they are very similar. For this reason, we find the treatment of Rule C seizures constitutionality relevant to our present inquiry. *See Polar Shipping*, 680 F.2d at 637. *But see Merchants National Bank*, 663 F.2d at 1343.

29. We are aware that Supplemental Rules B and E are in the process of being amended to provide for *ex parte* judicial review and an immediate postattachment hearing. We interpret this,

The *lienor* would then be denied due process under the Fifth Amendment. *Merchants National Bank of Mobile v. Dredge General G.L. Gillespie*, 663 F.2d 1338, 1344 (5th Cir. Unit A 1981) (discussing the seizure requirements of Supplemental Rule C).[28]

In addition to complicated facts, the applicable law may be unfamiliar to district judges. Although many judges may be familiar with the admiralty law routinely applied in the federal courts, many attachment cases are based upon the maritime law of foreign countries with which there may be differences of opinion among legal experts. *See Inter-American Shipping Enterprises, Ltd. v. T/T Tula*, 1982 AMC 951 (E.D.Va.1981) (charter party dispute resolution required piercing corporate veils in the United States, the Bahamas, Mexico, and Greece and a determination of the law of the Bahamas). Moreover, in many maritime jurisdictions judges may not be available at the crucial time and a convenient place. In Alaska, for instance, a judge may well be in Anchorage, while a writ of attachment is sought in the distant ports of Juneau and Valdez. In view of the near impossibility of making an immediate and informed judicial determination at an *ex parte* hearing of the appropriateness of an attachment, and the probable delays that would ensue from requiring such a hearing, we refuse to find the procedure required by the fifth amendment.[29]

We agree that " '[t]he basic protection required for the debtor is the assurance of

though, not as an admission that Rule B, absent such an amendment, is unconstitutional, but rather as an attempt to end litigation over attachments and to eliminate any speculation as to the constitutionality of the procedure. *See* Proposed Amendments to the Supplemental Rules for Certain Admiralty and Maritime Claims, 98 F.R.D. 374 (1983) (Advisory Committee's Explanatory Statement). *See also* Culp, *Charting a New Course: Proposed Amendments to the Supplemental Rules for Admiralty Arrest and Attachment*, 15 J. Mar. L. & Com. 353, 387–89 (1984). We note, however, that this legislation will have no effect on litigation over attachments issued prior to Rule B's amendment.

a prompt postgarnishment hearing before a judge.'" *Polar Shipping*, 680 F.2d at 640 (quoting *North Georgia Finishing*, 419 U.S. at 611 n. 3, 95 S.Ct. at 725 n. 3 (Powell, J., concurring)). Bottacchi's property was attached on May 25, 1982, and it received a hearing on May 26.[30] If there were any procedural deficiency or injustice in the issuance of the writ, it could have been raised at that time. An immediate postattachment hearing strikes a workable balance between the creditor's need to reach the property before it leaves the court's jurisdiction and a debtor's fear that his property will be unjustly attached. Such a hearing provides a maritime debtor with the process he is due. *See Trans-Asiatic Oil, Ltd.*, 743 F.2d at 962–63; *Polar Shipping*, 680 F.2d at 640–41; *Amstar*, 664 F.2d at 912; *Merchants National Bank*, 663 F.2d at 1344.

### C.

Due process is too realistic a concept to justify mechanical applications that are insensitive to the various contexts in which it is used. Admiralty law addresses unique commercial needs arising from maritime operations; to apply due process considerations discussed in other commercial or consumer situations to the present case would be to misconstrue the nature of the concept. The *Sniadach* line of cases should be used as a general guideline, not a mold into which myriad situations must be fitted. We find the concept of due process sufficiently flexible and the realm of admiralty sufficiently distinct to uphold the constitutionality of the procedures afforded Bottacchi by the district court in the exercise of its inherent power to apply maritime law. The lower court erred in addressing the facial constitutionality of Rule B(1). The judgment of the district court is, accordingly,

REVERSED.

JOHNSON, Circuit Judge, dissenting in which VANCE, Circuit Judge joins:

On May 25, 1982, Leonhardt's attorneys sought and obtained a writ of attachment against bunkers and stores owned by Bottacchi, which property was aboard a ship. In seeking to attach Bottacchi's property, Leonhardt's attorneys followed the maritime attachment procedures specified in Rule B(1) of the Supplemental Rules for Certain Admiralty and Maritime Claims to the Federal Rules of Civil Procedure. In the present case, Bottacchi challenged the constitutionality of Rule B(1). The majority holds that, although Leonhardt sought a writ of attachment pursuant to Rule B(1), the attachment procedures followed by the district court in issuing the writ were derived from the court's inherent admiralty powers, independent from the statutory powers granted by Rule B(1). Consequently, the majority does not reach the question of the constitutionality of Rule B(1). Because I conclude that the district court's power to issue the writ derived exclusively from Rule B(1), and that Rule B(1) violates the Due Process Clause of the Fifth Amendment, I dissent.

I. Rule B(1) Provided Exclusive Authority For The Writ.

In 1966, the Supreme Court promulgated a set of amendments to the Rules of Civil Procedure, which amendments unified civil and admiralty procedures. The Supreme Court's promulgating order of February 28, 1966, explicitly rescinded the Admiralty Rules of 1920 that had been in effect, and stated that the 1966 amendments "shall govern all proceedings in actions brought thereafter...." 383 U.S. 1031–32.

Rule B(1), governing maritime attachment and garnishment procedures, was included among the Supplemental Rules for Certain Admiralty and Maritime Claims that were part of the 1966 amendments. Rule A of the Supplemental Rules stated

---

**30.** Bottacchi argues that, although the hearing was prompt, it was not adequate because the district court only considered the constitutionality of Rule B(1). The record, however, shows that Bottacchi's lawyer raised the constitutional issue, and there is no indication that he was prevented from bringing other issues to the court's attention.

that the Supplemental Rules were to apply to the procedure followed in admiralty and maritime claims with respect to four specific types of remedies: (1) maritime attachment and garnishment; (2) actions *in rem;* (3) possessory, petitory, and partition actions; and (4) actions for exoneration from or limitation of liability.

In explaining the scope of the Supplemental Rules, the advisory committee indicated that the Rules were not intended to limit or impair the traditional power of a district court, acting consistently with the Supplemental Rules, "to secure the just, speedy, and inexpensive determination of every action." Supplemental Rule A advisory committee note. The majority interprets the advisory committee note to support the view that the maritime rules "were not intended to be the exclusive source of maritime procedure available to the courts." *Supra* at 1533. It is apparent that the advisory committee sought to instruct district court judges that the Supplemental Rules did not prevent them from devising appropriate procedures to cover situations *other than* the four covered by the Supplemental Rules. However, the advisory committee note does not mean that, with respect to actions that *are* covered by the Supplemental Rules, district courts are free either to follow or to disregard the Rules, depending upon what the situation requires.

The majority's argument trivializes Rule B(1) into a guideline that may or may not be followed, depending on whether the district court chooses to resort to its statutory authority or to its "inherent power to apply traditional maritime law." *Supra* at 1533. Contrary to the majority's view, Rule B(1) is now the exclusive source of authority for a district court to issue a maritime writ of attachment. Since the present case involved a maritime writ of attachment issued pursuant to Rule B(1), the majority erroneously avoids addressing appellee's challenge to the constitutionality of that rule.

## II. Rule B(1) Violates Due Process.

The defendants in the present case argue that Rule B(1) fails to provide adequate due process protections in the context of a prejudgment deprivation of property. *See Sniadach v. Family Finance Corp.*, 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972); *Mitchell v. W.T. Grant Co.*, 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974); *North Georgia Finishing, Inc. v. Di-Chem, Inc.*, 419 U.S. 601, 95 S.Ct. 719, 42 L.Ed.2d 751 (1975). A pre-seizure hearing may be foregone under certain circumstances of an emergency nature, but only where other protections adequately safeguard the interests of the defendant. These protections include the requirements that: (1) the plaintiff make a specific, detailed factual showing of its need for the attachment, *see Mitchell*, 416 U.S. at 615–16, 94 S.Ct. at 1904–05; *North Georgia Finishing*, 419 U.S. at 607, 95 S.Ct. at 722; (2) a judge, who has discretion to deny the issuance of the appropriate writ, approve the seizure, *Johnson v. American Credit Co.*, 581 F.2d 526, 533–34 (5th Cir.1978); and (3) the defendant be afforded an immediate post-seizure hearing at which time the plaintiff must prove entitlement to the writ of attachment. *Mitchell*, 416 U.S. at 618, 94 S.Ct. at 1905; *North Georgia Finishing*, 419 U.S. at 607, 95 S.Ct. at 722.

Rule B(1) provides that in maritime *in personam* actions the plaintiff may obtain a prejudgment attachment of a defendant's goods or chattels, usually a vessel and its contents, if the defendant is not found within the district. The rule requires that the plaintiff submit a verified complaint asking for the writ of attachment. The complaint must be accompanied by an affidavit that states, on information and belief, that the defendant cannot be found within the district. The affidavit must be signed by either the plaintiff or his attorney. Upon the receipt of the verified complaint and accompanying affidavit, the clerk of the court is required to issue the writ of attachment.

Rule B(1) authorizes the attachment of property without a prior hearing, and without any of the protections that are constitutionally required to protect the interests of

the defendant. The creditor is not required to make a specific, detailed showing of the efforts made to ascertain whether or not the defendant can be found within the district. Rather, the creditor need only allege the conclusion that, on information and belief, the defendant cannot be found within the district. The judge has no discretion to deny the writ of attachment if he is not satisfied that the writ should be granted. Indeed, a judge has no part in the process at all; it is a court clerk who must grant the writ of attachment when the appropriate complaint and affidavit is presented. Finally, although in the present case Bottacchi was afforded a hearing one day after its property was attached, a prompt postattachment hearing is not required by Rule B(1). In short, Rule B(1) has virtually the same deficiencies as the statute held unconstitutional in *North Georgia Finishing*. *See* 419 U.S. at 607, 95 S.Ct. at 722.

In arguing that additional procedural protections were not required in the present case, the majority emphasizes the unique context of admiralty law, in which a defendant can easily remove his property from the jurisdiction of the court on short notice. In essence, the majority argues that, because additional procedural protections will not necessarily prevent wrongful attachments and may provide the defendant with the short time needed to remove his property, such protections are not required by due process. Most significantly, the majority claims that, because of the difficulty in determining whether an attachment is appropriate, a preattachment *ex parte* hearing and judicial issuance of the writ of attachment would prove ineffective in discerning wrongful attachments and therefore can be foregone. *Supra* at 1538–1539.

The fact that it may be difficult to discern accurately when a writ of attachment should issue does not justify the failure to require *any* preattachment effort to determine the appropriateness of the writ. On the contrary, this difficulty justifies heightened procedural protections for maritime property owners. *See Mitchell*, 416 U.S. at 617–18, 94 S.Ct. at 1905–06. A preattachment *ex parte* hearing before a judge, at which time the plaintiff would be required to provide a specific, detailed basis on which the judge could determine the appropriateness of the writ, would afford some protection from the erroneous attachment of maritime property. A judge's review of the plaintiff's submissions might indicate not only that the defendant might be found within the district or that the defendant does not own the property sought to be attached, but also that there is no danger that the defendant will remove his property from the jurisdiction. In that case, where no emergency exists, there would be no reason to dispense with the full due process protection of prior notice and a hearing.

Although plaintiffs might have a heightened interest in expedited procedures in the context of maritime commerce, property owners do not have lessened property interests just because their property is connected with a ship. Maritime property owners, like other property owners, have a constitutionally protected interest in not having their property wrongfully attached. Rule B(1) does not provide adequate protections from the wrongful attachment of maritime property. Accordingly, I would hold that Rule B(1) violates the Due Process Clause of the Fifth Amendment.